# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD P. FOLEY, on behalf of himself and all others similarly situated,<br><br>       Plaintiff,<br><br>vs.<br><br>TRANSOCEAN LTD., STEVEN L. NEWMAN, and ROBERT L. LONG,<br><br>       Defendants. | Civil Action No. 10-cv-5233 (NRB)<br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

## TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ......................................................................... 2

    A. Defendants Misrepresented Transocean's Safety Protocols and Personnel Training ............................................................................. 3

    B. The *Deepwater Horizon* Disaster and Aftermath Reveal Previously Misrepresented and Concealed Material Facts Concerning Transocean's Safety Protocols, Personnel Training and Maintenance Practices ............................................................... 10

II. JURISDICTION AND VENUE ...................................................................... 13

III. PARTIES ...................................................................................................... 13

    A. Lead Plaintiff, Danica Pension A/S ................................................... 13

    B. Defendants ........................................................................................ 13

        1. Transocean Ltd. ......................................................................... 13

        2. Robert L. Long ........................................................................... 14

        3. Steven L. Newman ...................................................................... 14

    C. The Individual Defendants' Public Reporting Responsibilities ........... 15

IV. STATEMENT OF FACTS ............................................................................. 17

    A. Background ......................................................................................... 17

    B. Transocean's Relationship with BP .................................................... 19

    C. The *Deepwater Horizon* .................................................................... 20

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD ...................................................................................... 22

    A. Defendants' False and Misleading Statements Concerning Transocean's Safety Protocols, Maintenance, and Personnel Training Prior to the April 20, 2010 Disaster ...................................... 22

    B. Macondo Blowout – A Monumental Catastrophe ............................... 32

    C. The Truth Begins To Be Revealed ..................................................... 36

i

VI.    ADDITIONAL SCIENTER ALLEGATIONS .................................................. 56

    A.    Defendants Were Responsible for Supervising All Aspects of Project Safety Throughout the Company .................................. 57

    B.    During the Class Period Defendants Knew or Were Reckless in Disregarding Facts and Information Suggesting Their Statements Were Not Accurate .......................................................... 63

        1.    Defendants Had Access to and Reviewed the Company's Internal Safety Related Information ............................ 63

        2.    Defendants Received Safety Audit Reports Demonstrating Recurring and Systemic Problems Related to Personnel Training and Maintenance Failures .......................... 66

        3.    Defendants Commissioned a "Safety-Culture" Audit Confirming Transocean Had Inadequate Safety Protocols and Personnel Training ...................................... 67

        4.    Defendants Knew or Recklessly Disregarded Information Revealing Systemic Problems Related to Equipment Maintenance, Particularly BOPs ............................ 70

        5.    Defendants' Internal Documents Reveal Systemic Problems Related to Inadequate Safety Training ..................... 75

        6.    Defendants Knowingly Made a Series of Decisions that Increased the Risk of Loss of Well Control .............. 78

        7.    Regulators Notified Transocean of Systemic Safety Issues with Its Policies and Equipment .......................... 79

VII.    LOSS CAUSATION ................................................................ 84

VIII.    GROUP PLEADING ............................................................... 85

IX.    THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ............................................................................. 85

X.    THE STATUTORY SAFE HARBOR IS INAPPLICABLE ......................... 86

XI.    CLASS ACTION ALLEGATIONS ................................................ 87

XII.    CAUSES OF ACTION ............................................................. 89

    COUNT I Violation Of § 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder ...................................................... 89

COUNT II Violation of § 20(a) Of The Exchange Act ...................................................... 93

XIII.   PRAYER FOR RELIEF ................................................................................................. 94

XIV.   DEMAND FOR TRIAL BY JURY ................................................................................. 94

This is a securities class action brought by Danica Pension A/S ("Lead Plaintiff," or "Danica"), by and through its attorneys, on behalf of all persons and entities (the "Class") who purchased or otherwise acquired securities issued by Transocean Ltd. ("Transocean" or the "Company") during the period from August 5, 2009 through July 23, 2010 (the "Class Period").

Lead Plaintiff's allegations are based upon information and belief, except those allegations concerning Lead Plaintiff, which are based upon personal knowledge.   Lead Plaintiff's information and belief is based upon, among other things, its investigation, conducted by and through its attorneys, into the facts and circumstances alleged herein including, without limitation:  (a) review and analysis of certain filings made by Transocean with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of certain press releases, public statements, news articles, investigations, and other publications disseminated by or concerning the Defendants named herein and related parties; (c) review and analysis of certain Transocean press conferences, analyst conference calls and conferences, and the corporate website of Transocean;  (d) review  and  analysis  of  securities  analyst  reports  concerning Transocean and its operations; and (e) review and analysis of prepared statements and other testimony given in connection with ongoing governmental investigations, including the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Commission") and related documents.[1]  Lead Plaintiff believes that further substantial evidentiary support exists for the allegations set forth below, which will be revealed after a reasonable opportunity for discovery.

---

[1] The Commission was established by executive order by President Obama one month after the April 2010 blowout and explosion in the Gulf of Mexico.  With a budget of $15 million and a staff of scientists, lawyers, engineers and policy analysts, the Commission was charged with "examin[ing] the relevant facts and circumstances concerning the root causes of the *Deepwater Horizon* oil disaster."   In January 2011, the Commission released its findings in a 381-page report.  In February 2011, the Chief Counsel to the Commission released a 357-page companion report (the "Chief Counsel's Report").  Both reports detail Transocean's inadequate safety, training and maintenance practices, as discussed herein.

## I.      SUMMARY OF THE ACTION

1.      On April 20, 2010, a devastating explosion occurred on the *Deepwater Horizon* ("DWH"), a semi-submersible mobile offshore drilling unit owned by defendant Transocean and leased by BP p.l.c. ("BP"), at the Macondo deepwater well site in the Gulf of Mexico.  The explosion occurred while the rig crew was sealing off the exploratory well, so that it could later be reopened by a rig that would put the well into oil production.  The explosion and the events that followed culminated in the largest oil spill in history, causing untold human, economic, and environmental damage.

2.      This action is brought on behalf of Transocean's investors who purchased the Company's securities during the Class Period at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact concerning Transocean's company-wide safety, personnel training, and maintenance practices.  Specifically, during the Class Period, Defendants masked systemic and rampant project safety problems at Transocean, instead falsely painting the Company as focused and committed to project safety and preventative measures.  On the date of the catastrophic explosion and continuing through July 23, 2010, the truth concerning the severity and magnitude of Transocean's safety and maintenance problems leaked to the market, costing Lead Plaintiff and the Class billions of dollars in economic losses.

3.      Transocean is the world's largest offshore drilling contractor.  Prior to the Macondo blowout, Transocean was deemed "the Cadillac" of the oil rig industry.  For 2009, the Company reported revenues of $11.56 billion and earnings per share of $9.87.  Transocean's shares trade on the New York Stock Exchange ("NYSE") under the symbol "RIG."  At the beginning of the Class Period, RIG shares traded at $80.33 per share, and the Company's market capitalization exceeded $25 billion.

2

4.     Prior to and throughout the Class Period, Defendants portrayed Transocean as a "safety first" company.  The Company stated that its goal was an "incident-free workplace" and boasted that "safety was a core value" of Transocean.  In its SEC filings, Company publications and on its Company website, Transocean touted its commitment to extensive personnel safety training and celebrated the Company's efforts to protect its employees, equipment, and the environment.

5.     Because of the complexities and dangers inherent in deepwater oil drilling, analysts and investors understood that safety-related incidents may occur from time to time at Transocean and at other companies within the industry.  For this reason, the market placed great emphasis on whether incidents were one-time "anomalies," as opposed to "systemic" problems, which could be expected to materially affect a company's revenue efficiency and utilization rates going forward.  As set forth herein, during the Class Period, Defendants misrepresented this important distinction to the market, repeatedly assuring investors that the Company's incidents were anomalies, while denying that the problems were systemic in nature.  As revealed to the world beginning on April 20, 2010 and as confirmed by numerous governmental and private investigations, nothing was further from the truth.

**A.     Defendants Misrepresented Transocean's Safety Protocols and Personnel Training**

6.     On August 5, 2009 – the first day of the Class Period – defendant Steven L. Newman ("Newman"), then President and Chief Operating Officer ("COO"), was asked on a conference call with analysts whether the Company's lower-than-expected "utilization rate" from deepwater drilling activities could be attributed to any "quarter-specific" incidents.  Newman explained that Transocean had suffered "human error incidents" and a handful of problems with a piece of rig equipment called a blowout preventer ("BOP") during the quarter.  Assuring

investors that these incidents were outliers that the Company had fully resolved, defendant
Newman stated:

> We had a couple of human error incidents on drill floors on a couple of those rigs.
> And we had a handful of BOP problems, ***nothing that I would characterize as
> systemic*** or quarter-specific.  We did a deep dive on each one of those incidents;
> we've identified the root causes.  ***We're going back to address them in our
> management system so they don't happen again.  It's uncharacteristic in the
> second quarter; they were anomalies, and I think I'd just leave it at that.***

(Emphasis added).

When asked by analysts if the incidents would affect the upcoming third quarter, Newman
added:

> ***No, no, no.  They've all been resolved.*** BOP operations are a complex part of our
> business.  ***It's something we pay a lot of attention to.  All of the BOP incidents
> that occurred in the second quarter have been resolved, and we'll continue to
> keep our eye closely on the performance of our subsea equipment.***

(Emphasis added).

7.      Defendant Newman's statements on August 5, 2009 were materially false and
misleading when made.  At the time the statements were made, Transocean was experiencing
undisclosed company-wide safety and maintenance deficiencies and failures.  Instead of mere
"anomalies," as Newman represented to investors, the incidents discussed during the conference
call were recurring instances of a failed and flawed safety and maintenance culture.  The
problems were ongoing and rampant, and Newman misled investors by stating these types of
incidents had been resolved.

8.      For example, as of August 5, 2009, and undisclosed to the public, Transocean's
personnel training was inadequate.  Among other things, the Company's rig employees were not
properly trained in areas including "hazard analysis," "well monitoring," and "emergency
response situations."  Moreover, Transocean relied almost solely on "on-the-job training," with
little, if any, formalized training program.

9.      Transocean's maintenance protocols were similarly defective.   Although the Company represented that it was committed to safety, the Company systematically engaged in practices on its rigs that were clearly unsafe.   For example, Transocean's maintenance records were "substandard," often missing information and containing such little detail that it was difficult to determine what maintenance jobs had been completed.   Specifically, with respect to BOPs – the equipment that Newman represented the Company "paid a lot of attention to" – it was Transocean's company-wide practice to destroy test records for a BOP at the end of each well's lifetime.   BOP maintenance was critical as, undisclosed to the public, Transocean's "strictly confidential" study commissioned to review the reliability of BOPs, revealed a 45% failure rate for BOPs in deepwater rigs.   BOP maintenance was also placed at risk by the Company's "Subsea Maintenance Philosophy" – that repairs would be made based on the rig crew's perception of the equipment's condition, which did not always comport with manufacturer recommendations, American Petroleum Institute ("API") recommendations, and Minerals Management Service ("MMS")[2] regulations.

10.     Further, the culture on the Company's rigs prioritized profits over safety. Company rig workers expressed fears of being reprimanded by management if they reported problems.   Many workers were uncomfortable and hesitant with the concept of "calling a timeout for safety."   It was understood by many rig workers that the Company's drilling priorities took precedence over planned maintenance.   In one employee's words, the safety manuals were understood to be "written for the courtroom, not the oil field."

---

[2] The MMS is a federal agency charged with ensuring oil and gas leasing, exploration, development, and production is conducted in a safe and environmentally sound manner.  The MMS is also responsible for approving permits and collecting revenues generated by lease sales and royalties.  The agency has been criticized by the Commission and others for its lax oversight of the oil industry.  Following the DWH incident, the MMS was reorganized to separate the conflicting roles of enforcing safety regulations and maximizing revenues from offshore operations.

11.     On the DWH, one of Transocean's most important rigs, safety and equipment maintenance problems were widespread at the start of and throughout the Class Period.  Certain pieces of major rig equipment on the DWH were so run down that they were characterized as "junk" by Transocean's Chief Electrical Technician.  Other critical equipment on the rig was so outdated that replacement parts were no longer available from the original equipment manufacturers.  Further, inspections were not done properly or on time.  Many key pieces of equipment, including the BOP, had not been fully inspected since 2000.  Best evidencing the abysmal maintenance policies and procedures at Transocean at the start of the Class Period, just weeks after Newman's August 5, 2009 comments, Transocean senior management was told by BP – the lessee of the DWH – that BP's safety audit of the rig revealed ***390 preventative maintenance tasks that had not been performed by Transocean on the DWH.***

12.     After the August 2009 conference call, notwithstanding Defendants' assurances that the "anomalies" had been resolved, severe "incidents" continued to occur on Transocean rigs at an alarming rate.  On September 3, 2009, on the *Cajun Express*, a Transocean drillship contracted by Repsol E&P USA Inc. ("Repsol") and operating in the Gulf of Mexico, a fatality occurred while conducting cement plug and abandonment operations similar to those that were occurring on the DWH at the time of the explosion.  During the operation on the *Cajun Express*, a Transocean pipe handler operator did not signal that he was undertaking a task that could result in injury to his co-workers, and did not check to see if the pipe handler spotter was in harm's way while "tubulars" were being relocated on the rig.  As a result, the pipe handler spotter suffered a fatal blow to the head.

13.     As a result of the fatality, the MMS immediately investigated the incident on the *Cajun Express.*  The incident was also investigated by Transocean and Repsol, whose interviews

and findings were also incorporated into the MMS report.  In February 2010, the MMS issued a report concluding that the Company's failure to adequately train its employees was a contributing factor to the cause of the incident.  Specifically, the MMS report criticized the Company's safety training policies and program, finding numerous deficiencies.  For example, the MMS found that Transocean failed to provide a "more formalized" training program that identified or analyzed hazards, provided insufficient classroom/textbook training, and issued operations "certifications" based upon unchallenging and elementary aspects of rig tasks.

14.     Similarly, on December 23, 2009, just months before the DWH explosion and right in the middle of the Class Period, Transocean barely averted a disastrous blowout during completion activities in the North Sea.  Transocean's own internal investigation of this event, which was reviewed by the Commission, determined that the "near-miss" on the North Sea rig was, again, caused by failures attributable to Transocean's training and safety policies. Amazingly, Defendants did not ensure that the "lessons learned" from the North Sea incident were shared with any employees on other Company rigs, including the DWH, during the Class Period.

15.     Defendants were aware of the "incidents" on the *Cajun Express* and in the North Sea and knew of or recklessly disregarded the systemic training and safety failures that caused these problems.  Despite this knowledge, however, Defendants continued to mislead the market. In a conference call conducted on February 24, 2010 in connection with Defendants' discussion of Transocean's results for fiscal year 2009, analysts again inquired about the possible "recurring" nature of the Company's safety problems, particularly those related to BOPs critical to deepwater drilling:

> [Tom Curran - Wells Fargo - Analyst:]  Question in terms of where utilization
> came in below what you would have expected based on scheduled downtime,

*were there any issues remotely similar to those that occurred in the second quarter of 2009 where we had both technical problems related to BOPs, as well as what was categorized as some human error problems?*

[Newman:]   On the ultra-deepwater fleet, Tom, where we were particularly focused in the fourth quarter and that differs from where we were in the second quarter of last year, which was on the conventional deepwater fleet.  *In the Ultra-Deepwater fleet, we only had one BOP issue and one human error issue.*  We had a couple of startup issues and we had some equipment failures.  But the issues in the fourth quarter were largely dissimilar from what we saw in the second quarter of last year.

[Curran:]  So would it be fair to say then that both the nature and the number of those issues in Q4 was more in line with what you would consider normal, whereas second-quarter 2009 was clearly abnormal?

[Newman:]  Yes, I wouldn't characterize the fourth quarter of 2009 — I wouldn't characterize the performance on the Ultra-Deepwater fleet as normal, because it was below the historical revenue efficiency for that class.  So I don't want to lead you to conclude that that is something we ought to expect going forward.

*But we have identified the issue, the equipment failure issues.  We have addressed the BOP control issue.  And the human error issue is something we continue to focus on through our training and competency programs.*

(Emphasis added).

16.     Thus, defendant Newman effectively portrayed the 2009 incidents as either "anomalies," or issues the Company had already solved or addressed through their "training" programs.

17.     In its 2009 Annual Report on Form 10-K filed with the SEC on February 24, 2010, Transocean again touted, "we conduct extensive personnel recruiting, training and safety programs."  In a letter to shareholders dated March 24, 2010 (accompanying the April 2, 2010 Annual Report publication), defendant Newman stated that, although the Company experienced four employee fatalities during 2009, the Company remained committed "to create an incident free-workplace, all the time, everywhere."

18.     Defendants' statements in February and March 2010 were materially false and misleading when made.   Specifically, Defendants knew or recklessly disregarded that Transocean's safety protocols, training programs, and attention to maintenance were seriously flawed and deficient.  In addition to the information that rendered their August 2009 statements false and misleading, Defendants knew or recklessly disregarded the following information that evidenced systemic safety, training and maintenance-related failures by early 2010:

- Since 2008, despite owning less than half of the oil rigs operating in the Gulf of Mexico in water greater than 3,000 feet deep, Transocean rigs accounted for nearly three out of every four incidents triggering investigations by the federal government for safety or other issues;

- Transocean employees did not utilize or even understand many of the Company's safety processes and procedures;

- On the DWH, employees were struggling with "loss of well control," including "kicks" and possible BOP damage caused by a pipe falling into the well;

- On the DWH, the BOP was "leaking fluid" on at least three separate occasions by March 2010;

- The BOP on the DWH suffered from a "range of problems including a leaking door seal, a diaphragm on the purge air pump needing replacement," "several error-response messages," and "extraordinary difficulties" surrounding the maintenance of the BOP's "annulars";

- Transocean had tested the DWH BOP at much "lower pressure" than ordinary and standard testing required;

- DWH workers believed that the rig was long overdue for a dry-dock maintenance overhaul;

- There were dozens of deficiencies on the DWH affecting critical equipment that Transocean employees realized may lead to loss of life, serious injury or environmental damage; and

- DWH workers cited at least 26 components and systems on the rig that were in "poor" or "bad" condition.

19.    Sadly, these misrepresented and concealed facts only began to be disclosed to the market on April 20, 2010, through a tragic and unfathomable environmental incident, which subsequent governmental and private investigations have concluded could have been prevented by Transocean through proper personnel training and safety vigilance – the same training and vigilance that Defendants falsely told investors were in place during the Class Period.

**B.    The *Deepwater Horizon* Disaster and Aftermath Reveal Previously Misrepresented and  Concealed Material Facts Concerning Transocean's Safety Protocols, Personnel Training and Maintenance Practices**

20.    At 9:45 p.m. on April 20, 2010, a raging fire began on the DWH caused by a sudden explosion from leaked hydrocarbons (an unwanted influx of fluid or gas into the well is called a "kick"), killing eleven people on board the rig – including nine Transocean employees. After burning uncontrollably for more than a day, the DWH sank into the Gulf of Mexico on April 22, 2010.

21.    The explosion and fire from the "kick," which went undetected by Transocean employees until it was too late, and the sinking of the DWH ultimately caused the largest marine oil spill in history, inflicting massive economic and environmental damage on the Gulf region. As the DWH sank, it pulled with it a "riser" connecting the rig to the BOP.  The result:  crude oil began to gush from the well into the Gulf of Mexico at cataclysmic levels.  Crew members from both BP and Transocean attempted to activate the BOP – the final and vitally important barrier against a full blown spill – following the explosion and fire.  All of their attempts failed.

22.    Despite numerous additional attempts to curb the massive oil leak with government assistance, crude oil continued to spew into the Gulf of Mexico until approximately July 15, 2010, when the damaged well was temporarily capped 86 days after the date of the explosion.  On September 19, 2010, the well at Macondo Prospect was declared "effectively dead," permanently sealed by relief wells.

23.     Consensus estimates after the explosion and spill were capped reveal that, all told, roughly five million barrels of oil were released from the Macondo well, with approximately 4.2 million barrels pouring into the waters of the Gulf of Mexico.  The oil slick produced by the DWH spill covered as much as 28,958 square miles, an area approximating the size of South Carolina.  The DWH spill far eclipses any other oil catastrophe in history in size and severity.

24.     As set forth in detail herein, the DWH disaster began to reveal Transocean's previously concealed problems with safety, training, and maintenance, facts known or recklessly disregarded by Defendants during the Class Period.  While Defendants consistently assured analysts and investors that Transocean's dedication to safety was of paramount importance to the Company and that past incidents were mere aberrations, Transocean was, in fact, riddled with failures and deficiencies relating to its safety protocols, employee training and maintenance policies and procedures.

25.     Indeed, since the DWH disaster, government reports and other sources have concluded that the most massive oil spill in history was not the result of a one-time accident or unforeseeable malfunction.  Rather, as set forth by the Commission, "[w]hat the investigation makes clear, above all else, is that management failures, not mechanical failings, were the ultimate source of the disaster."  The Commission went even further,  "[b]etter management of personnel, risk, and communications by BP and [Transocean] would almost certainly have prevented the blowout.  The Macondo disaster was not inevitable."  As alleged herein, Transocean's safety and training deficiencies were known to Defendants during the Class Period and were directly at odds with Defendants' rosy and ameliorative misleading public statements.

26.     The Commission found evidence of systemic failure at the Company – the type of failure Defendants specifically denied to analysts and investors throughout the Class Period –

11

with respect to safety training, practices, maintenance, and procedures.  Further, the findings of systemic failure at Transocean during the Class Period are confirmed by, among other things: (1) an audit of the DWH performed by BP in September 2009, the results of which were communicated to Transocean senior management; (2) an investigation by the MMS of the *Cajun Express* in September 2009; (3) an audit performed by Lloyd's Register ("Lloyd's") on Transocean's safety and training practices and procedures in March 2010; and (4) testimony before the Joint U.S. Coast Guard/Bureau of Ocean Energy Management, Regulation and Enforcement Investigation Committee ("U.S. Coast Guard Commission") of Transocean employees and industry experts.

27.     Moreover, BP has specifically identified the failure of the BOP on the DWH as a primary cause of the disaster.  As detailed herein, Defendants knew, yet recklessly ignored, major warning signs and red flags concerning the BOP's operation on the DWH during the Class Period.  Further, the Chief Counsel's Report found: "post-explosion examination revealed low battery charges in one BOP control pod and a faulty solenoid valve in another.  If these preventative maintenance failings were present at the time of the incident, they would have prevented the deadman and autoshear functions from closing the blind shear ram" – and the sealing off of the well by the BOP.

28.     The DWH disaster and the subsequent revelation of Transocean's culpable role in the tragedy decimated the value of Class Members' Transocean securities.  From April 20, 2010 through July 23, 2010, RIG shares shed nearly $47.00 per share as the market digested the true condition of the Company, costing shareholders over $15.1 billion in market capitalization.

29.     As alleged herein, Lead Plaintiff and the Class have been damaged by Defendants' conduct in violation of the federal securities laws.

## II.      JURISDICTION AND VENUE

30.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

31.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

32.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  At all relevant times, Transocean's common stock traded on the NYSE, which is located within this District.

33.      In connection with the acts alleged in this Consolidated Class Action Complaint ("Complaint"), Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

## III.      PARTIES

### A.      <u>Lead Plaintiff, Danica Pension A/S</u>

34.      Lead Plaintiff, Danica, purchased shares of Transocean common stock on the NYSE during the Class Period, as detailed in the Certification appended to this Complaint as Exhibit A, and has been damaged by Defendants' conduct.

### B.      <u>Defendants</u>

#### 1.      **Transocean Ltd.**

35.      Transocean offers deepwater and harsh environment drilling, oil and gas drilling management, and drilling engineering and project management services.  Transocean also explores, develops, and produces oil and gas properties located primarily in the United States offshore Louisiana and Texas, and in the United Kingdom sector of the North Sea. As of

13

March 31, 2010, the Company owned and operated 140 mobile offshore drilling units comprising 46 high-specification floaters, 26 midwater floaters, 10 high-specification jackups, 55 standard jackups, and 3 other rigs.

36.     During the Class Period, Transocean was a Swiss company based in Vernier, Switzerland, with its United States office located in Texas.  Transocean's common stock is listed and trades on the NYSE under the symbol RIG.  Transocean's transfer agent and registrar (The Bank of New York Mellon) is also located in New York.

### 2.     Robert L. Long

37.     Defendant Robert L. Long ("Long") served as Transocean's CEO and was a member of the Board from October 2002 until February 28, 2010, when he retired and was replaced by defendant Newman.  Defendant Long signed Transocean's 2009 Annual Report on Form 10-K filed on February 24, 2010, which was then incorporated into the 2009 Annual Report issued on April 2, 2010.  As alleged herein, defendant Long made materially false and misleading statements during the Class Period, including those in Transocean's SEC filings.

### 3.     Steven L. Newman

38.     Defendant Newman has served as Transocean's Chief Executive Officer ("CEO") since March 1, 2010, a member of the Company's Board of Directors (the "Board") since May 14, 2010, and President of the Company since May 2008.  Newman also served as COO from May 2008 until November 2009 and resumed those duties from December 2009 until February 2010.  Defendant Newman signed Transocean's Form DEF 14A definitive proxy statement issued on April 1, 2010 and the 2009 Annual Report issued on April 2, 2010.  As alleged herein, defendant Newman made materially false and misleading statements during the Class Period, including those in Transocean's SEC filings.

14

39.     Defendants Long and Newman are hereafter referred to together as the "Individual Defendants."

40.     Defendants Transocean, Long and Newman are referred to collectively as the "Defendants."

### C.     The Individual Defendants' Public Reporting Responsibilities

41.     As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE during the Class Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, risks, employee training and risk management, maintenance protocols, and regulatory compliance, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  As alleged herein, the Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

42.     The Individual Defendants participated in drafting, preparing, and/or approving the various public reports and other public communications addressed herein, and they knew, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Transocean, each of the Individual Defendants knew of or had access to the adverse undisclosed information concerning the Company's safety protocols, risk management and employee training, maintenance and design problems, BOP problems, and the Company's operating and safety record, as particularized herein, and knew or

recklessly disregarded that these adverse material facts rendered the positive representations made by or about Transocean and its business, issued or adopted by the Company, materially false and misleading.

43.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or to cause them to be corrected.  Accordingly, each of the Individual Defendants was responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

44.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Transocean securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  Defendants made, or caused to be made, materially false and misleading statements, or failed to disclose material facts concerning, among other things:  (i) Transocean's safety, training and equipment maintenance protocols; (ii) the heightened risks associated with the BOPs used by the Company; (iii) the likelihood that Transocean's safety protocols, including those relating to the BOPs, would be ineffective when drilling at depths similar to those of the DWH; and (iv) the Company's significant exposure to liability resulting from these unmitigated hazards.  Defendants' materially false and misleading statements and/or omissions of material fact, artificially inflated the prices of the Company's securities during the Class Period, and caused

16

Lead Plaintiff and other members of the Class to purchase Transocean securities at artificially inflated prices.

## IV.   STATEMENT OF FACTS

### A.   <u>Background</u>

45.     Defendant Transocean is the world's largest offshore drilling contractor, providing floating mobile drilling rigs, as well as the equipment and personnel necessary for operation of the drilling rigs for lease to major oil producers.  Transocean imposes daily charges for the use of its rigs, equipment and personnel.  These "day rates" can be as high as $650,000 for Transocean's deepwater drillships, capable of drilling in ultra-deep depths of 10,000 feet or more.  Referred to by analysts as "the Cadillac" of the industry prior to the Macondo blowout, Transocean's motto is, "We are never out of our depth, from the shallow water to the ultra-deepwater."

46.     In addition to owning and leasing oil rigs, Transocean provides, maintains, and operates a range of subsea equipment, including the BOP and associated control systems.  The BOP is a critical piece of equipment on a deepwater drilling rig.  As described by the Chief Counsel's Report:

> The BOP is  a giant assembly of valves that latches on to the wellhead. The BOP stack serves as both a drilling tool and a device for controlling wellbore pressures. The BOP stack is connected back to the rig by the lower marine riser package ("LMRP") and the riser. The riser is a sequence of large diameter high-strength steel pipes that serves as the umbilical cord between the rig and the BOP during all remaining drilling operations. Once rig crews lower the BOP and riser system into place atop the wellhead, they perform the rest of their drilling operations through this system.  The drill string, drilling tools, and all the remaining casing strings for the well go down into the well through the riser and the BOP.
>
> *       *       *
>
> A BOP stack is also a potential barrier.  By closing various individual rams in a BOP stack, rig personnel can close off the well, thereby preventing hydrocarbon

17

flow up the well and into the riser.  When a BOP ram is closed, it becomes a barrier to flow.

47.    Below is a rendering of the well with the BOP in place on the sea floor from the

Chief Counsel's Report:



48.    Transocean typically provides trained personnel to operate its leased rigs and perform the important tasks Transocean is responsible for as the rig owner, including well control.  Although the rig lessee retains the right of inspection and approval of the work performed on its behalf, the actual performance and supervision of the work is normally Transocean's ultimate responsibility.

49.    In addition to requiring trained, highly-skilled workers to successfully operate deepwater rigs, the rigs themselves are incredibly expensive.  The offshore drilling business is significantly capital intensive.  For example, the DWH rig cost $350 million to build and had an insured value of $560 million.  Therefore, once a rig is built, the rig owner – such as Transocean

18

– is highly motivated to put it, and keep it, online and operating.  A rig that is dormant, whether it be for maintenance reasons or otherwise, is costly.

50.     Consequently, the most watched industry metric is the "rig utilization rate" – the total actual number of revenue earning days as a percentage of the total number of calendar days in the period – an indicator of how active a Company's rig fleet is.  Idle and stacked rigs are included in the calculation and reduce the utilization rate to the extent these rigs are not earning revenues; and new builds are included in the calculation upon acceptance by the customer.  Rig utilization is so important that Transocean regularly updates its Fleet Summary, which tracks a rig's usage with details on specific rig contract terms and expected idle periods.  Analysts follow the metric closely.

### B.     Transocean's Relationship with BP

51.     As a frequent lessee of Transocean's rigs, BP is Transocean's most significant customer.  In 2008 and 2009, BP accounted for 11% and 12%, respectively, of the Company's operating revenues.  As Transocean stated in its 2009 Form 10-K Annual Report, retention of BP's business is of utmost importance. "The loss of this significant customer could, at least in the short term, have a material adverse effect on our results of operations.  No other customer accounted for 10 percent or more of our 2009 operating revenues."

52.     BP is the largest producer of oil and gas in the Gulf of Mexico, and is the largest oil lease acreage-holder in the Gulf of Mexico.  BP budgeted to spend $15 billion drilling the Gulf between 2002 and 2012.  By 2010, BP had become the world's fourth-largest corporation of any kind (based on yearly revenues of approximately $246 billion), producing 4 million barrels of oil per day.  Ten percent of this output came from the Gulf of Mexico.

53.     As a rig and well lease holder, BP contracts with rig owners and operators, such as Transocean, in order to access oil and natural gas, which it in turn markets to consumers.  As

the lease operator, BP is responsible for, among other things, geologic assessment of subsurface formation, engineering design of the well and obtaining regulatory approvals required for construction of the well.  BP is also responsible for retaining and overseeing the contractors who supported well design and various aspects of the drilling operations.  During drilling operations, BP staffs the rig with personnel who represent BP's interests in operations related to the well.

54.    BP typically retains and relies on contractors to provide engineering and operations services, drilling equipment and personnel to conduct BP's deepwater drilling operations.  Generally, however, a lease holder such as BP does not operate the rig itself – that is Transocean's job.  For example, on the day of the DWH explosion, only seven of the 126 employees on the DWH were BP employees, while 79 were Transocean employees.  Contractors hired by BP aboard the leased rigs typically operate under their own management systems, supplying their own (or sub-contracted) personnel, equipment and materials as needed.  Contracts issued by BP regarding rig operation and leasing generally cover multi-year terms.

55.    BP is Transocean's biggest single client in the Gulf of Mexico.  At the time of the DWH blowout, BP leased 4 of the 14 Transocean rigs in the Gulf.  According to the Company's contract with BP for the DWH, Transocean was required to, *inter alia*, "***maintain well control equipment and use all reasonable means to control and prevent fire and blowouts.***"

**C.    The *Deepwater Horizon***

56.    The DWH was a $560 million dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.  From its maiden voyage to its sinking in the Gulf of Mexico on April 22, 2010, it was leased from Transocean by BP for drilling exploratory wells.  The DWH was moved to the Macondo prospect site after another Transocean rig, the *Marianas*, was damaged in a hurricane.  As the Company boasted in its March 24, 2010 letter to shareholders signed by defendant Newman,

20

which enclosed the Company's 2009 Annual Report, the DWH drilled the deepest oil and gas

well, setting a world record.  The well was drilled to a depth of 35,050 feet including 4,130 feet

of water.

57.     Set forth below is a depiction of the DWH from the Chief Counsel's Report:



58.     Pursuant to its drilling contract with the Company, BP paid Transocean a daily

operating rate of $533,495 for the use of the DWH.  With additional costs (fuel, expendables,

and services), BP was paying approximately $1 million per day to operate the DWH.  Under its

contract, BP was not obligated to pay Transocean for time in excess of 24 hours each month

spent on certain equipment repairs.  Seeking to make the most of the DWH rig's potential for

profitability, Transocean did not send the DWH rig to dry dock for maintenance or repair since it

was built in 2001.

59.     While BP had planned for the drilling work at Macondo to take 51 days, at a cost

of approximately $96 million, operations quickly fell far behind schedule.  Numerous problems

encountered during the drilling process earned the "well from hell" reference commonly used by

the DWH workers to describe the Macondo well.  On October 17, 2009, Transocean and BP

agreed to extend the DWH lease from September 2010 through 2013.  The three-year extension increased costs to BP, requiring BP to pay $544 million over the three-year period, without taking into account the additional operating costs estimated by the Commission to bring the total daily cost to $1 million.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD

### A.   Defendants' False and Misleading Statements Concerning Transocean's Safety Protocols, Maintenance, and Personnel Training Prior to the April 20, 2010 Disaster

60.    Throughout the Class Period, Defendants misrepresented and omitted material facts concerning the existence, focus, and efficacy of Transocean's project safety and maintenance protocols, procedures, and training.  Among other things, Defendants painted Transocean as a company that: (1) committed to safety as a "core value,"; (2) possessed a strong focus on preventative maintenance; and (3) provided top-quality training of its personnel.

61.    For example, before and during the Class Period, Transocean represented itself to the market as a company focused on "safety first."   In the Company's "2008 Letter to Shareholders" dated April 1, 2009, defendant Long represented the following:  "Our goal is to have an incident-free work environment all the time, everywhere, and we will continue to do all we can to achieve this goal."  In the Company's 2009 Proxy Statement filed on Form DEF 14A with the SEC on or about April 9, 2009 and signed by defendant Newman, Defendants similarly boasted:

> Our business involves numerous operating hazards and we remain committed to protecting our employees, our property and our environment.  Our ultimate goal is to create ''an incident-free workplace—all the time, everywhere.''   The [Executive Compensation] Committee sets our safety performance targets at high levels each year in an effort to motivate our employees to continually improve our safety performance toward this ultimate goal.

Transocean added, "We are committed to safety as a core value of the company . . . ."

22

62.     Moreover, assurances regarding the Company's focus and commitment to safety, maintenance and training were made in the Company's information magazine "for our employees, customers and other key audiences" available during the Class Period at the Company's website www.deepwater.com called *Beacon*, formerly called *Offshore Frontiers*:

- "The client is very demanding and the relationship with the rigs is very intense**. *But it's because of the combination of management and client focus that we have a much higher safety culture.*" (Transocean Safety, Training and Environmental Affairs Manager Bernard Lucas, July 2008 *Offshore Frontiers*).

- "Being an older rig, there is a **strong focus on preventative maintenance** and keeping the rig fresh." (Transocean Rig Manager Regulo Salas, July 2008 *Offshore Frontiers*).

- "***We work closely with HR, go way out of our way to train our people*** and then send them around the world . . . . Training and development starts on Day 1 . . ." (Transocean Rig Manager Ricardo Solis, July 2008 *Offshore Frontiers*).

- "Our safety vision of an incident-free workplace with the support of our client is the single most important driver behind our integrated services business." (Transocean Senior Vice President of the Asia and Pacific Unit Deepak Munganahalli, July 2008 *Offshore Frontiers*).

- All incidents are jointly investigated with rigour using the Root Cause Analysis processes by both companies.  Actions from the incident Investigations are recorded and tracked by senior management at bi-weekly action tracking meetings.  (July 2008 *Offshore Frontiers*).

- ***The training Transocean offers is top quality.  So good, in fact, that it poses another problem.  Other companies want our people!***  The company combats this industry poaching by showing people that they work for a company with strong values that "walks the talk."  (Fall 2009 *Beacon*).

(Emphasis added).

63.     In addition to their boastful statements regarding the Company's corporate-wide commitment to safety, preventative maintenance, and training, Defendants also made materially

false and misleading statements during the Class Period designed to assuage analyst concerns with problems on certain of the Company's rigs that arose during the second quarter of 2009.

64.     Specifically, on August 5, 2009, the Company conducted a telephone conference with analysts to discuss Transocean's results for the second quarter of 2009.  The Company's reported rig utilization rate was 84% during 2Q 2009, compared to 87% for 2Q 2008.  When asked why rig utilization and deepwater revenue had come in below expectations for the quarter, and whether the cause was "quarter-specific," defendant Newman assured the market that the problem was "uncharacteristic" and not "systemic":

> Arun Jayaram – Credit Suisse – Analyst: Yes, good morning.  Bob, I was wondering if you could comment a little bit at least in this quarter about the deepwater revenue efficiency?  The utilization I guess for all three segments was below my expectations.  Just wondered if you can comment if there's any quarter-specific items that led to lower-than-expected utilization?
>
> *                *                *
>
> Steve Newman – Transocean, Inc. – President and COO:  Good morning.  Arun, how are you?  The deepwater segment of the fleet, which is the 4,500 to 7,500 foot segment, 16 rigs in that fleet, was the largest underperformer in the second quarter.  ***We had a couple of human error incidents on drill floors on a couple of those rigs.  And we had a handful of BOP problems, nothing that I would characterize as systemic or quarter-specific.  We did a deep dive on each one of those incidents; we've identified the root causes.  We're going back to address them in our management system so they don't happen again.  It's uncharacteristic in the second quarter; they were anomalies, and I think I'd just leave it at that.***
>
> [Jayaram:]  Steven, ***any of those issues, could they impact Q3, these BOP issues that you're citing?***
>
> [Newman:]  ***No, no, no.  They've all been resolved.  BOP operations are a complex part of our business.  It's something we pay a lot of attention to.  All of the BOP incidents that occurred in the second quarter have been resolved, and we'll continue to keep our eye closely on the performance of our subsea equipment.***
>
> (Emphasis added).

65. Defendants' characterization in August 2009 that the Company's safety and equipment incidents during the second quarter of 2009 were "anomalies," as opposed to the products of "systemic" failure, was heavily relied upon by the market as true. For example, the following positive analyst reports were issued shortly after the August 5, 2009 conference call:

- An August 5, 2009 analyst report from RBC Capital Markets stated that "Outlook For Deepwater Remains Favorable. Despite lower utilization in 2Q09 due to human error and issues with BOPs *the outlook for deepwater remains solid in both the near-term and long-term*."

- An August 5, 2009 analyst report from Morgan Keenan stated that "After six offshore drilling peers posted earnings above Street consensus, RIG fell short of expectations as revenue fell 8% sequentially despite operating costs increasing 9% compared to the first quarter. Weaker than anticipated results came from unexpected downtime on several rigs related to *uncommon operational incidents* and the continued stacking of rigs rolling off contract."

- An August 5, 2009 analyst report from Credit Suisse stated "Q2 downside was primarily driven by higher than expected operating costs ($0.12) and lower revenues ($0.12). *While disappointing, it appears that the bulk of the miss was primarily associated with quarter-specific issues that do not appear to significantly impact the go-forward earnings power of the company. Specifically, RIG indicated that $30 MM of the lower revenue was related to major operational incidents concentrated amongst their deepwater rig fleet, primarily related to BOP issues that have since been solved*."

- An August 7, 2009 analyst from Wells Fargo stated that "Management explained that the 16-unit deepwater fleet's disappointing utilization and revenue efficiency rates of 82% and 83% reflected a combination of (1) BOP problems (pressure control equipment) and (2) human errors on the drill floor involving 'a couple of those rigs'. *COO Newman said that both issues were 'uncharacteristic . . . anomalies', asserting the root causes had been identified and resolved. Since '06, management has amassed a credibility-solidifying record of performance that makes it comfortable for us to trust Newman's reassuring diagnosis.*"

(Emphasis added).

66. Defendants' statements in August 2009, however, were materially false and misleading when made. At the time of the representations, Defendants knew or recklessly

disregarded that the Company was suffering "systemic" failures and problems with respect to personnel training, safety, and preventative maintenance.

67.     Specifically, by the start of the Class Period, Transocean's purported "top quality" personnel training was flawed and inadequate.   Among other things, the Company's rig employees were not properly trained in areas including "hazard analysis," "well monitoring," and "emergency response situations."   Moreover, Transocean relied solely on "on-the-job training" and incorporated little, if any, formalized classroom/textbook training.   Thus, contrary to Defendants' statements, the incidents occurring at Transocean were not random or isolated "human error"; rather, the incidents stemmed from Company-wide shortcomings in training its workforce – a systemic failure.

68.     Transocean's preventative maintenance and safety protocols and procedures were similarly defective.   Although the Company represented that it was committed to safety, the Company systematically engaged in maintenance practices on its rigs that threw caution to the wind.   For example, specifically with respect to BOPs – the equipment that Newman represented the Company "paid a lot of attention to" – it was Transocean's company-wide practice to destroy test records for a BOP at the end of each well's lifetime, undermining the Company's ability to perform adequate BOP maintenance.   Overall, as described by BP, Transocean's maintenance records were of "substandard" quality, "with missing information and poor quality reports that lacked sufficient detail to convince the reader that the task had actually been performed in accordance with procedures."

69.     Critical BOP maintenance was also placed at risk by the Company's  "Subsea Maintenance Philosophy."   Typically, on Transocean rigs during the Class Period, repairs would be made based solely on the rig crew's perception of the equipment's condition, rather than

being determined by manufacturer recommendations, API recommendations, and/or MMS regulations.  Indeed, rig crews would track "the condition of the BOP in the [RMS "and only make the repairs if the rig crew "feel[s] that the equipment is beginning to wear."

70.     Further, the Company's Rig Management System ("RMS"), implemented as a result of Transocean's merger with Global Santa Fe in 2007, was described by its employees as a "work in progress," often producing preventative maintenance orders that were either erroneous or irrelevant to individual rig crews.  Moreover, maintenance and safety tests on Transocean rigs were often run with critical alarm and safety systems positioned in "bypass mode."

71.     Indeed, necessary preventative maintenance was overlooked across the Company rigs at the time of the August 2009 statements.  For example, certain pieces of major rigging equipment on the DWH were so run down that they were characterized as "junk" by Transocean's Chief Electrical Technician.  Other critical equipment on the rig was so outdated that replacement parts were no longer available from the original equipment manufacturers. Further, inspections were not done properly or on time.  Many key pieces of equipment, including the BOP, had not been fully inspected since 2000.

72.     Making matters worse and belying the Company's representation that it put "safety first," the culture at Transocean actually discouraged proper safety and maintenance practices.  For example, rig employees were hesitant to raise safety concerns with Company management out of fear of reprisal.  Rig workers attributed the failing condition of rig equipment to the unwritten policy across Transocean that drilling priorities and the fear of lost profits took precedence over planned maintenance.  Almost half of Transocean workers actually admitted being uncomfortable with calling a "timeout for safety."  Moreover, the Company's safety

manual was understood by Transocean workers to have been prepared only to try and limit the Company's liability for project safety incidents, not to be followed in the workplace.

73.     Symbolic of the abysmal maintenance policies and procedures at Transocean at the start of the Class Period – mere weeks after Newman's August, 2009 representation that the Company "keeps a close eye on its subsea equipment" – Transocean senior management was told by BP that BP's internal safety audit of the DWH rig revealed *390 preventative maintenance tasks that had not been performed by Transocean on the DWH.*

74.     Thus, by the start of the Class Period, Transocean's subpar safety and maintenance culture contradicted the rosy picture Defendants portrayed publicly with respect to the Company's focus on safety, preventative maintenance and training.

75.     After the August 2009 conference call, notwithstanding Defendants' assurances that the "anomalies" had been resolved, severe "incidents" continued to occur on Transocean rigs at an alarming rate.  On September 3, 2009, a fatality occurred on the Company's *Cajun Express* drillship.  In a report issued in February 2010, which incorporated interviews and findings from Transocean and Repsol's investigation into the incident, the MMS criticized the Company's safety training policies and programs, finding numerous deficiencies existed at the time of the fatality in September 2009.  For example, the MMS found that Transocean failed to provide a "more formalized" training program that identified or analyzed hazards, provided insufficient classroom/textbook training, and issued operations "certifications" based upon unchallenging and elementary aspects of rig tasks.

76.     Similarly, on December 23, 2009, months before the DWH explosion and right in the middle of the Class Period, Transocean barely averted a disastrous blowout during completion activities in the North Sea.  Transocean's own internal investigation of this event,

which was reviewed by the Commission, determined that the "near-miss" on the North Sea rig was caused by failures attributable to Transocean's training and safety policies. Amazingly, Defendants did not ensure that the "lessons learned" from the North Sea incident were shared with any employees on other Company rigs, including the DWH during the Class Period.

77.     Defendants were aware of the "incidents" on the *Cajun Express* and in the North Sea and knew of or recklessly disregarded the systemic training and safety failures that caused the problems. Despite knowledge of these systemic failures, Defendants continued to mislead the market.

78.     On February 24, 2010, Transocean issued its 2009 Annual Report on Form 10-K signed by defendant Long. In both the "Employees" and "Labor Agreements" sections, the Company made misstatements about the technical acumen and training of its employees, stating: "We require highly skilled personnel to operate our drilling units. As a result, ***we conduct extensive personnel recruiting, training and safety programs***." (Emphasis added).

79.     On February 24, 2010, Defendants held a conference call to discuss the Company's year-end and fourth quarter 2009 results. For the year ended December 31, 2009, rig utilization was at 80%, as compared to 90% for the previous year. Total fleet average utilization for the fourth quarter of 2009 was 69%, as compared to 90% in the same quarter the year prior. During the call, analysts again questioned Transocean on the cause of missed utilization rates and decreased revenues. Newman assured analysts, and the market, that any problems, including the "BOP control issue," had been identified, resolved, and were isolated incidents.

> [Tom Curran – Wells Fargo – Analyst:] Question in terms of where utilization came in below what you would have expected based on scheduled downtime, ***were there any issues remotely similar to those that occurred in the second quarter of 2009 where we had both technical problems related to BOPs, as well as what was categorized as some human error problems?***

[Newman:]   On the ultra-deepwater fleet, Tom, where we were particularly focused in the fourth quarter and that differs from where we were in the second quarter of last year, which was on the conventional deepwater fleet.  In the Ultra-Deepwater fleet, we only had one BOP issue and one human error issue.  We had a couple of startup issues and we had some equipment failures.  But the issues in the fourth quarter were largely dissimilar from what we saw in the second quarter of last year.

[Curran:]   So would it be fair to say then that both the nature and the number of those issues in Q4 was more in line with what you would consider normal, whereas second-quarter 2009 was clearly abnormal?

[Newman:]   Yes, I wouldn't characterize the fourth quarter of 2009 — I wouldn't characterize the performance on the Ultra-Deepwater fleet as normal, because it was below the historical revenue efficiency for that class.  So I don't want to lead you to conclude that that is something we ought to expect going forward.

***But we have identified the issue, the equipment failure issues.  We have addressed the BOP control issue.  And the human error issue is something we continue to focus on through our training and competency programs.***

(Emphasis added).

80.     Thereafter, on April 1, 2010, Transocean issued its definitive proxy statement for the Company's 2010 annual general meeting of shareholders, which was filed with the SEC on Form DEF 14A signed by defendant Newman.  The Proxy claimed that although the Company's executives qualified for bonuses under the safety metrics in place, the executives were receiving no bonuses since the Company had "incurred four fatalities with varying causes in varying regions around the world."  The Proxy asserted that:

The [Executive Compensation] Committee took this extraordinary action to underscore ***the Company's commitment to safety*** and to increase the incentive for executive officers to promote the goal of an incident-free workplace and, in particular, the avoidance of future fatal accidents.

(Emphasis added).

81.     Defendants' statements from February through April 2010 were materially false and misleading when made.  Contrary to the "safety first" platform the Company celebrated publicly, Transocean was suffering from company-wide failures in safety and preventative

maintenance.  Indeed, since 2008, despite owning less than half of the oil rigs operating in the Gulf of Mexico in water greater than 3,000 feet deep, Transocean rigs accounted for nearly three out of every four incidents triggering investigations by the federal government for safety or other issues.  Further, the only fires investigated by the MMS on deepwater drilling rigs since 2005 had taken place aboard Transocean rigs.   Indeed, after the *Cajun Express* and North Sea incidents, Defendants acknowledged that their safety and maintenance protocols were failing systemically as the Company retained Lloyd's, a third-party risk assessment organization, to gather and document project safety related information from the Company's world-wide fleet of rigs.

82.     By way of example, with respect to the DWH, Defendants were aware of the following information that contradicted their public statements concerning BOP maintenance and safety and further evidenced systemic failure at Transocean:

- DWH employees were struggling with "loss of well control," including "kicks" and possible BOP damage caused by pipe falling into the well;

- The BOP on the DWH was "leaking fluid" on at least three separate occasions by March 2010;

- The BOP on the DWH suffered from a "range of problems including a leaking door seal, a diaphragm on the purge air pump needing replacement," "several error-response messages," and "extraordinary difficulties" surrounding the maintenance of the BOP's "annulars";

- Transocean had tested the DWH BOP at much "lower pressure" than ordinary and standard testing required;

- DWH workers believed that the rig was long overdue for a dry-dock maintenance overhaul;

- Transocean knew of dozens of cited equipment deficiencies that could lead to loss of life, serious injury or environmental damage; and

- DWH workers had cited at least 26 components and systems on the rig that were in "poor" or "bad" condition.

31

83.     Thus, with respect to Defendants' statements that equipment failure issues, including the Company's BOPs, had been addressed, problems at the DWH evidenced otherwise.

84.     Sadly, these misrepresented and concealed facts demonstrating systemic failure only began to be disclosed to the market on April 20, 2010, through a tragic and unfathomable environmental incident, which subsequent governmental and private investigations have concluded could have been prevented by Transocean through proper personnel training and safety vigilance.

**B.      Macondo Blowout – A Monumental Catastrophe**

85.     The systemic training and safety failures within Transocean began to be exposed to the public when the DWH disaster commenced.  In the hours leading up to the Macondo well blowout on April 20, 2010, the DWH crew, including Transocean employees, missed several key early warning signs indicating that the well was not properly sealed, that a "kick" was occurring, and that a resulting loss of well control was possible:

> **5:05 p.m.:**  A loss of riser fluid signaled that a critical seal was leaking. Soon after, the crew ran a negative-pressure test to determine whether the well was sealed.  The results suggested a possible breach, and a second test was ordered.

> **6:45 p.m.:** The second negative-pressure test confirmed the possible loss of well-control.  Over the next thirty minutes, the drill pipe pressure rose to 1400 psi, which the Chief Counsel's Report viewed as the "clearest indication yet that the well" was leaking fluids.

> **8:35 p.m.:** Uneven balance was observed as workers pumped seawater in to flush the riser at a rate of 900 gallons per minute but mud flowed out at a rate of 1200 gallons per minute.

> **9:08 p.m.:** The rig crew kept the pump rates constant, although the pressure on the drill pipe began to rise.  The Chief Counsel's Report stated:

> > The change in direction was by now clear and clearly anomalous.  An individual who saw the drill pipe pressure increase should have been seriously concerned and should have investigated further.

The rig crew next shut down the pumps and began its next task. However, "flow-out continued beyond the [DWH's] typical flow-out signature" for another minute after the pumps shut down. The Chief Counsel's Report determined that this was an obvious "kick indicator" that the driller, assistant driller or the mudlogger watching the screen could have seen.

**9:14 p.m.:**  Over the next five minutes, there was an increase of approximately 250 psi on the drill pipe. According to the Chief Counsel's Report, "[t]his was a significant anomaly," and that by 9:14 p.m., "the increase would have been noticeable and a cause for concern."

**9:27 p.m.:**  The crew noticed a "differential pressure" between the kill line (approximately 800 psi) and the drill pipe (approximately 2,500 psi), resulting in the crew shutting down the pumps to investigate.

**9:30 p.m.:**  A second increase in pressure on the drill pipe (550 psi) lasted five minutes. With the pumps shut down, there should have been no movement in the well. There is no evidence showing that any rig crew members made an inquiry into these pressure increases. Rather, the pressure was just bled off the drill pipe. When the rig crew closed the drill pipe valve, "the drill pipe pressure shot back up," increasing by approximately 600 psi at approximately 9:38 p.m.

86.     At 9:47 p.m., several hours after the first indication that a loss of well-control was possible, the Macondo well blew with highly-pressurized, explosive gas shooting through the BOP and up the riser to the rig floor. A 240-foot geyser shot up from the top of the derrick, showering an icy slush of evaporating methane back down onto the rig and DWH crew members. Both the alarm and shutdown systems failed to trip, leaving the rig workers to attempt to manually activate the various safety systems aboard the DWH.

87.     Two minutes after the blowout, a rig engine exploded as two engineers responded to a frantic call for more mud to control the well. The engineers and four others in an adjacent room were killed instantly; five other workers also perished. Seventeen more workers were seriously injured.

88.     Next, workers attempted to activate the BOP to seal the well and avert any significant oil spill into the Gulf. Despite there being three redundant BOP activation systems – the Emergency Disconnect Switch (the "EDS"), Automatic Mode Function or "Deadman

Switch" (the "AMF") and a remotely operated vehicle (the "ROV") – the DWH crew failed to seal the well.

89.     First, at 9:56 p.m., the crew activated the EDS to disconnect the rig from the well and activate the critical blind shear ram to seal the well.  The cables and hydraulic lines needed to operate the EDS had, however, been crippled by the explosion minutes earlier.  With the EDS disabled and communication lost between the rig and the well, the AMF should have automatically activated the blind shear ram.  The AMF sequence failed to activate due to long-standing maintenance issues with the control pods – one lacked charge and the other had a defective part.  Once it was determined that the EDS and AMF shut-off systems failed to seal the well, Transocean attempted to use ROVs to activate the blind shear ram with a "hot stab" intervention procedure.  Once in place, the ROVs conducted several "hot stab" attempts to close the well, but could not develop the hydraulic pressure needed to activate the blind shear rams due to maintenance issues, specifically a leak.

90.     As the BOP rams failed, rig officers ordered an abandon ship.  The remaining personnel faced chaos and flames as they rushed to board lifeboats – two of the four had been blasted away by the explosion.  Others jumped from the burning rig into the dark Gulf of Mexico.  Several rig employees have since given interviews about their poor treatment following their escape from the rig.  The horror did not end there, however.  It would be months before the well was plugged and the environmental and economic impacts continue to this day.

91.     After the rig sank, ROVs were used again in an attempt to plug the well between April 25 and May 5.  However, the ROV intervention was delayed due to Transocean's "undocumented modifications" to the BOP and the port to which the ROV connected.  Ultimately, these efforts failed as well.

92.     After several failed, and highly publicized, attempts to plug the Macondo well, it was capped after 86 days in July 2010.  The result was the largest oil spill in world history. Roughly five million barrels of oil were released by the Macondo well, of which 4.2 million poured into the Gulf of Mexico.  Prior to the Macondo spill, the largest oil spill in U.S. waters resulted in 300,000 barrels, or 6% of the Macondo spill, spilling into the Pacific Ocean.

93.     As a result of the Macondo spill, on May 27, 2010, President Obama issued a drilling moratorium and licensing changes.  Particularly, he decreed that:

    a.  No new drilling would be allowed in water depths over 500 feet for six months;

    b.  Drilling on 33 wells was suspended as soon as possible;

    c.  Drilling offshore Alaska would be postponed at least until 2011;

    d.  Certain lease sales in the Gulf of Mexico and elsewhere would be reviewed or cancelled; and

    e.  In the same announcement, the President announced the creation of the Commission, whose purpose was to "consider both the root causes of the disaster and offer options on what safety and environmental precautions are necessary."

94.     White House Energy Advisor Carol Browner described the Macondo spill as the "worst environmental disaster the U.S. has faced."  The oil slick in the Gulf of Mexico covered almost 30,000 square miles.  Several large oil plumes have also been discovered in the deep waters of the Gulf.  The spill first reached land in Louisiana, and by June, tar balls and oil mousse washed ashore in Mississippi, Florida, Alabama and Texas.  Soon, all Gulf States saw oil saturating marshes and slicks blanketing the shores.  Indeed, eight national parks have been threatened by the spill.  The U.S. Fish and Wildlife Service reported that up to 32 National Wildlife Refuges may have been affected by the spill.

95.     The Macondo spill also had a momentous impact of the Gulf economies.  The four biggest industries in the Gulf of Mexico – oil, tourism, fishing and shipping – account for $234 billion in economic activity each year.  If it were a country, the Gulf of Mexico would be the 29th largest economy in the world.

96.     Due to the Macondo spill's economic impact on commercial and recreational fisheries, U.S. Commerce Secretary Gary Locke declared a "fishery disaster" in the Gulf of Mexico on May 24, 2010.  By June 2, 2010, the National Oceanic and Atmospheric Administration banned fishing in almost 90,000 square miles of the Gulf of Mexico, or about 36% of federal waters.

97.     All told, the Macondo spill is expected to permanently alter the Gulf Coast ecosystem and economy.

### C.     The Truth Begins To Be Revealed

98.     In the days, weeks and months following the Macondo blowout, through investigative reporting, governmental hearings and witness testimony, the true state of Transocean's safety, employee training, and maintenance protocols for its highly technical deepwater rigs began to leak out to the investing public.

99.     On April 29, 2010, *The Wall Street Journal* published an article that revealed that (i) the Company did not equip the DWH with "a remote control shut-off switch" designed to activate the BOP in an emergency situation, and (ii) unmanned submarines were still unable to activate the BOP to seal off the well – an indicator that the Company suffered from recurring and systemic problems related to personnel training and maintenance failures.  On this news, which revealed that Transocean's attention to safety was a major contributing factor to the disaster, the Company's stock price plunged $6.60 from its $85.11 opening price to close at $78.51 on April 29, 2010.

36

100.    On April 30, 2010, *The New York Times* published an article entitled "Oil Spill's Blow to BP's Image May Eclipse Out-of-Pocket Costs," providing new evidence regarding Transocean's failure to maintain its equipment.  In the article, BP placed the blame for the loss of well control squarely on Transocean's shoulders, and tied the loss of well control to the "failure of a piece of [the Company's] equipment."   As a result of the foregoing news, the Company's stock price fell another $6.19 to close at $72.32.

101.    On May 5, 2010, Defendants announced in the Company's SEC Form 10-Q that the Departments of Homeland Security and Interior, including the MMS, had begun a joint investigation into Transocean and the cause of the continuing disaster, and that the Company had been requested to participate in disaster-related governmental hearings.  The Company had also received a notice from the U.S. Department of Justice ("DOJ") to preserve all information related to the Macondo blowout, and that one of the Company's subsidiaries had been designated as a source of oil discharges and designated as responsible party under the Oil Pollution Act of 1990.

102.    Thereafter, during the Company's May 6, 2010 earnings conference call, defendant Newman informed investors that another Transocean rig located in India had experienced a BOP failure requiring unplanned downtime.  In response to this news, which called into question the Company's representations that there were no outstanding BOP equipment issues, shares of Transocean common stock fell $3.06 per share to close at $69.70 per share on May 6, 2010, on heavy trading volume.

103.    On May 10, 2010, in an article published by *The Wall Street Journal* entitled, "Rig Owner Had Rising Tally of Accidents," further safety and equipment problems at Transocean were revealed.  In the article, it was reported that Transocean was involved in a remarkable 24 out of 33 incidents investigated by the MMS from 2005 to 2007 (approximately

73%), even though the Company owned *less than half* of the operating ultra-deep drilling rigs in the Gulf:

> Nearly three of every four incidents that triggered federal investigations into safety and other problems on deepwater drilling rigs in the Gulf of Mexico since 2008 have been on rigs operated by Transocean, according to an analysis of federal data.  Transocean defended its safety record but didn't dispute the Journal's analysis.

*        *        *

> Already the largest deep-water driller, Transocean in November 2007 took over rival GlobalSantaFe in an $18 billion deal.  A Journal analysis of records maintained by the U.S. Minerals Management Service found that Transocean's share of incidents in deep water investigated by the regulator has gone up since the [November 2007 merger with rival GlobalSantaFe], even accounting for its increased size.

*        *        *

> Since the merger, Transocean has accounted for 24 of the 33 incidents investigated by the MMS, or 73%, despite during that time owning fewer than half the Gulf of Mexico rigs operating in more than 3,000 feet of water.

104.   *The Wall Street Journal* article pointed out that this drop in performance did not go unnoticed by Transocean's customers.  Indeed, an industry survey of oil companies showed that oil producers that hired Transocean "perceived a drop in its quality and performance, including safety by some measures, compared with its peers," scoring "tops" in only one safety category.  According to data released to *The Wall Street Journal* by the International Association of Drilling Contractors, the Company's 2009 safety record, as measured by injuries per hours worked, may have been better than the overall industry average, however, the Company's overall safety record was "worse" than some of its deepwater competitors.

105.   *The Wall Street Journal* also analyzed industry survey data compiled by Energy Point Research that showed a trend that the Company's industry-wide project safety reputation was severely eroded after the 2007 merger with Global Santa Fe:

38

Before the merger, Transocean routinely ranked near the top in surveys by Energy Point Research, which rates oil-service firms on customer satisfaction. Since the merger, Transocean's rankings have fallen to close to the bottom in many categories.

In 2008 and 2009, the surveys ranked Transocean last among deep-water drillers for "job quality" and second to last in "overall satisfaction." For three years before the merger, Transocean was the leader or near the top in both measures.

106.    Larry McMahon ("McMahon"), the Company's Vice President ("VP") for Performance and a member of Transocean's senior management, is quoted in the May 10, 2010 *The Wall Street Journal* article as stating that the Company was "committed to safety and has a strong overall safety record," and that the Company "investigates all incidents and adjusts its procedures accordingly."   McMahon further represented in an apparent attempt to calm the market and cast the DWH event as a one-time anomaly:  "We are a learning company.  We do not make the same mistakes again."

107.    McMahon's statements made on behalf of Transocean in the course of his employment as the Company's VP for Performance as reported on May 10, 2010 by *The Wall Street Journal* were not true because they continued to conceal that Transocean had systemic deficiencies in its safety and maintenance protocols.  As demonstrated by the findings of the Chief Counsel's Report, Transocean did indeed make the same mistake twice – clearly demonstrated by the Company's failure to share critical safety and project training information learned from the North Sea incident in December 2009 with other rigs in its fleet, specifically the DWH, which if shared could have averted the Macondo disaster.

108.    The May 10, 2010 *The Wall Street Journal* article (based upon a review of data released to it by the MMS) reported a clear pattern of inadequate project safety by Transocean:

- In 2005, a well leaked drilling fluid because of problems with a cement seal meant to keep oil and gas from escaping from a well;

- In 2006, a blowout preventer failed due, in part, to the Company's ***failure to conduct proper preventative maintenance***;

- In 2006, while drilling another well for BP, a gauge on the *Enterprise* suggested a leak coming from the BOP.  One unmanned submarine attempted to shut down the well, but lacked enough hydraulic fluid to add to the valve.  As a result, a second unmanned submarine was sent down and eventually shut down the well five hours after the leak was discovered and after approximately 54 barrels of fluid spilled into the Gulf.  Notably, when pressed for answers by *The Wall Street Journal*, the Company refused to comment on the MMS' finding that the leak was caused, in part, by the Company's "***extended use of the BOP without inspection/maintenance***";

- In 2008, a rig worker violated Company policy by removing a piece of pipe without the proper authorization.  As a result, the DWH partially flooded and began to tilt;

- In 2009, a fire broke out on the brand-new Transocean rig, the *Discoverer Clear Leader*, disabling power to the thrusters that kept the rig in place above the well and prevent the rig disconnecting from the well and resulting in an uncontrolled spill; and

- Since 2005, the MMS investigated four fires aboard deepwater drilling rigs – all operated by Transocean.

(Emphasis added).

109.    On May 10, 2010, the day *The Wall Street Journal* reported the foregoing facts that were undisputed by the Company, the price of Transocean common stock fell an additional $1.67 per share.  This price decline occurred on a day in which the S&P 500 increased 4.3%.  The price of Transocean common stock fell $25.69 per share from April 20, 2010, through May 10, 2010, a decline of nearly 28%.

110.    Defendants attempted to stem the decline in its share price by misrepresenting and concealing additional material facts.  On May 28, 2010, the Company conducted an investor conference call, the purpose of which was to provide an update on the Macondo incident and answer questions.  During the call, in which it attempted to deflect responsibility for the blowout

to those responsible for well design (BP) and the cement job (Halliburton), without acknowledging any responsibility or failing by Transocean.  According to Newman:

> The most significant clue is that the events occurred after the well construction process was essentially finished.  Drilling had been completed on April 17 and the well had been sealed with casing and cement.
>
> For that reason the one thing we do know is that on the evening of April 20 there was a catastrophic failure within that essentially completed well.  This is supported by reports that a vessel which was alongside the rig at the time of the incident received cement-like debris, which could have only come from the well, on its decks.

111.   Newman's statements during the May 28, 2010 conference call were materially false and misleading when made because they falsely characterized and minimized Transocean's role in the cause of the Macondo well blowout.  The statements made were directly contradicted by the findings of the Chief Counsel, which found, *inter alia*, that Transocean was complicit in BP's decisions regarding the completion of the well.  In reaching its decision that the cement job sealing off the well was successful, BP had erroneously relied on Transocean employees' interpretation of a key negative pressure test – a test that was critical in determining the reliability of the cement job sealing off the well.  However, Transocean's rig crew did not have the "expertise and training" required to properly assess the test results.

112.   Next, during the same May 28, 2010 conference call, defendant Newman asserted that the Transocean crew could not possibly have played a role in the blowout since the loss of well-control and subsequent explosion happened quickly:

> ***It is also clear that the drilling crew had very little if any time to react***.  The initial indications of trouble and the subsequent explosions were almost simultaneously.

(Emphasis added).

113.   Newman's assurances were materially false and misleading when made because it is clear from the chronology outlined above that an extensive period of time existed between the

loss of well control and the DWH explosion.  According to the Chief Counsel's Report, the well underwent a "kick" sufficiently in advance of the explosion to avoid the explosion – undermining Newman's claim that the chain of events leading up to the explosion was simultaneous.  The Chief Counsel's Report found the rig crew was inadequately trained by the Company, noting that had they recognized the kick earlier, the blowout could have been avoided.  In addition to the findings of the Chief Counsel, the following findings by the MMS, Lloyd's, BP and Company audits also undermine Defendants' Class Period contentions that Transocean employed and maintained proper training and safety protocols.  These failures included:

- Transocean did not adequately train its employees with respect to "kick" detection and diagnosis during end-of-well, non-drilling activities, such as temporary abandonment.  For example, Transocean's Well Control Manual does not contain a section on monitoring or controlling the well during temporary abandonment procedures;

- Transocean did not properly train its employees regarding how to perform or interpret a "negative pressure test";

- Transocean did not properly train its employees with respect to "well monitoring," as its employees permitted and engaged in simultaneous operations that precluded adequate monitoring and kick detection;

- Transocean did not properly inform its employees of the objectives, procedures and hazards associated with riser displacement operation;

- Transocean did not properly share, update, or train employees with information from prior Company incidents and "near-misses";

- Transocean did not properly train its employees regarding how to respond to emergency well control situations such as when a "kick" or severe blowout occurs.  For example, Transocean's well control drill training did not focus on how to recognize an emergency and what steps to take immediately upon recognizing it;

- Transocean failed to share lessons learned from a similar "near miss" blowout in the North Sea on December 23, 2009 where a blowout was averted during completion of drilling activities.  Despite modifying the Company's protocols and manual to incorporate changes that the North Sea experience revealed as essential, this information was not made known Company wide – and not to workers on the DWH.

114.    During the May 28, 2010 conference call, Newman also asserted falsely that a failure of the Company's BOP could not have contributed to the disaster:

> There have been a number of questions raised about the BOP, and so I will try to address them today.  The Deepwater Horizon's BOP was tested, just as other BOPs are tested, every week for function and every other week for pressure containment capability.
>
> **The pressure containment capability of the BOP was tested and it passed those tests on April 10.  The function of the BOP was tested on April 17, and the BOP passed those tests as well.**
>
> (Emphasis added).

115.    Newman's claims of successful BOP pressure testing is grossly misleading, as it fails to inform investors that the pressure test thresholds had been reduced by Transocean and BP such that any "successful" test would not provide an adequate indicator of the equipment's ability to function in case of an emergency.  As the Chief Counsel's Report found, the pressure tests performed on the DWH's BOP were conducted at pressures ***below*** that required by regulation – and ***below*** the pressures under which they would be expected to operate during a blowout.  In no way did such tests indicate the BOP would have functioned properly on the day of the Macondo blowout.

116.    Also during the May 28th conference call, Newman misleadingly dismissed "rumors" that the annular seal on the BOP was damaged several weeks prior to the well blowout and that the BOP control pods' batteries were inadequately charged:

> ***There are rumors that rubber from one of the annulars was found in mud circulating from the well, indicating that one of the annulars couldn't function***.  I would point out that the annulars are designed to have pipe moved through them, and it is expected that there will be some wear on the annular as a result.
>
> The annular element itself is a large, 2,000-pound rubber diaphragm.  A small amount of rubber lost through the normal functioning of the annular preventer would not impair functioning.  And in fact the annulars were both successfully tested following this alleged event.

*There have also been erroneous rumors that the battery on one of the two BOP control system pods was drained*. These pods transmit electrical signals that come from the rig into action by the BOP.

We recovered the pod in question and, with the assistance of the original manufacturer and BP observers, we dismantled and tested the pod. The battery within the pod was measured twice and both times it exceeded the manufacturer's suggested minimum voltage.

(Emphasis added).

117. Defendant Newman's representations were materially false and misleading when made, as at that time, Defendants knew that the annulars had been damaged when, four weeks prior to the Macondo blowout, a rig worker "accidentally nudged a joystick, applying hundreds of thousands of pounds of force, and moving 15 feet of drill pipe through the closed blowout preventer" thereby damaging the annular—hardly the normal wear and tear depicted on the conference call by defendant Newman. A Transocean witness testified before the Commission that after this incident occurred, a man monitoring drilling fluid rising to the top of the well "discovered chunks of rubber in the drilling fluid" and brought them to the attention of the Transocean supervisor on duty, who shrugged it off and stated, "Oh, it's no big deal."[3] The Company supervisor's failure to recognize the significance of this event to the overall safety of the project, was just one more piece of evidence demonstrating Transocean's failed safety, training, and maintenance protocols – all of which Defendants were aware.

118. Defendant Newman's statements regarding the batteries in the BOP control pods during the conference call were also materially false and misleading when made. As the Chief Counsel's Report found, internal Transocean records suggest "that the crew had not replaced the

---

[3] It was a big deal. An industry expert testifying before the Commission, Dr. Bea, stated that the annular seal is a key piece of equipment used during pressure testing to determine if the well seal is leaking. Bea noted that when the annular seal is damaged (but has not yet completely failed), you may get pressure test readings, "but because you are leaking pressure, they are not reliable." Thus, any pressure test reading taken after the seal was damaged was inherently unreliable.

batteries on one pod for two-and-a-half years prior to the Macondo blowout and had not replaced the batteries in another pod for a year."  The Chief Counsel's Report further revealed, "This appears to have been a pattern:  Company records show that rig personnel found all of the batteries in one *Deepwater Horizon* BOP pod dead in November 2007."  These failings were significant.  According to the Chief Counsel's findings, "post-explosion examination revealed low battery charges in one BOP control pod and a faulty solenoid valve in another.  If these faults were present at the time of the incident, they would have prevented the deadman and autoshear functions from closing the blind shear ram" – and the sealing off of the well.

119.    During the Q&A, analysts focused their questions on the recent news events calling into question the functionality of the rig's safety equipment.  For example, Jeff Tillery, a Tudor Pickering Holt analyst, asked if "all safety equipment, pressure gauges, etc. that was [*sic*] supposed to be hooked up and functional [were] actually hooked up and functional at the time of the incident, to the best of your knowledge?"  Newman responded, "***As far as we know, yes***." (Emphasis added).

120.    However, Newman's assurance were once again materially false and misleading when made, as Defendants at this time were aware that the DWH had essentially failed its audit by BP conducted in September 2009, in which BP had identified and communicated to Transocean senior management approximately 390 "preventative maintenance" tasks that were not performed by Transocean on the DWH.  Further, defendant Newman's statements are once again contrary to the findings of the Chief Counsel that Transocean was aware that DWH rig employees were required to make a number of calculations by hand, as gauges on the rig were not operational.

121.     During the May 28 conference call, Arun Jayaram, a Credit Suisse analyst, asked Newman if he had any "thoughts" on BP's claim that it was Transocean's faulty BOP that caused the uncontrolled well blowout and subsequent oil spill in the Gulf.  Newman quickly dispelled this notion by falsely stating that the Company's BOP was not the root cause:

> Yes, I will tell you there has been a lot of talk about the outside of the BOP. I have been in front of Congress five or six times now.  I have been asked about the battery in the yellow pod, which I think I addressed in my opening comments. I have been asked about leaks in the hydraulic system. There are a couple of leaks that have been brought to my attention, neither of which would have impacted the BOP's ability to close.
>
> I have been in asked about the conversion that was done in 2005 at BP's request and at BP's expense. Been asked a lot of questions about the outside of the BOP. ***But none of those questions have really caused me any concern with respect to the basic fundamental capability of the BOP.  It was tested on April 10 and it was taped tested on April 17, and these are pass/fail tests. It is not like you can get an A- or a B+ and keep working. You either pass the test or you don't.***
>
> ***So because there has been a history of the BOP performing on the Deepwater Horizon and passing all those tests, none of the information that has been brought to light so far really has caused me any concern yet***.

(Emphasis added).

122.     Once again, Newman's assurance regarding the BOP's "passing" pressure tests was materially false and misleading when made.  Defendant Newman neglected to advise that the pressure tests the BOP passed were at lower pressures than required by regulations, lower than the pressures under which the BOP would be required to function properly should a blowout occur – and that these tests were conducted at reduced pressures to save time and money – at the expense of safety.

123.     Next, Mabel Yu, of Vanguard, questioned Newman as to whether the Company would still be protected under the indemnity clause if it is determined that the Company's failure to maintain its equipment led to the loss of well control and subsequent oil spill.  Newman reassured her and the market that the Company was fully protected:  "I don't want to speculate

on what the investigation might show, but what I will say is what we have said a couple of times. The indemnity under the contract from BP to Transocean is extremely broad."

124.    Additionally, Kurt Hallead of RBC Capital Markets asked Newman whether the Company would be protected under the indemnity clause if it is determined that the Company was grossly negligent in determining that the negative pressure test was a success.  Newman responded that that "***decision rested solely with BP***," rendering the Company completely insulated from any liability under the terms of the indemnity clause.

125.    Once again, Newman's assurance that Transocean was not responsible for the misreading of the negative pressure test is materially false and misleading—BP relied upon Transocean's employees' purported expertise and training in interpreting the results of the negative pressure test.  Indeed, it was the arcane "bladder effect" explanation strongly advocated for by Transocean (an "effect" which is not recognized or even heard of by anyone in the industry) to convince BP that the test was a success that caused the unfortunate false conclusion that the cement job sealing the well worked.  As the Chief Counsel's Report stated, "The Chief Counsel's team believes that the group of personnel involved in the Macondo negative pressure test – including Transocean drilling personnel and two BP well site leaders – decided as a group that the test had succeeded."

126.    In response to this mixed-news, the Company's share price fell an additional $2.94 to close at $56.77 on May 28, 2010.

127.    On May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article described newly-available internal BP documents that reporters obtained through a Freedom of Information Act Request (the "FOIA Request") that provided additional information to the market regarding Transocean's failings:

- "more than 50,000 pages of [internal BP] e-mail messages, inspection reports, engineering studies and other [BP] records . . . shed new light on the extent and timing of problems" with Transocean's BOP;

- "[t]he documents show that in March, after problems on the rig that included drilling mud falling into the formation, sudden gas releases known as 'kicks' and a pipe falling into the well, BP officials informed federal regulators that they were struggling with loss of 'well control'" and that on "at least three occasions" prior to the blow-out, BP identified that the Company's BOP was "leaking fluid";

- The reliability of the BOP testing performed by the Company prior to the blowout was called into question, as testing was performed at a much "lower pressure" (6,500 psi) than it had been previously tested (10,000 psi);

- A review of federal testing records for BOP testing done in the Gulf for the past five years revealed Transocean's testing at "lower pressure" was outside the norm, and that substantially reducing the testing pressure on a device with known maintenance issues – "rarely" occurred;

- In general, BOP testing pressures "continued at the same threshold or were done at increasing levels"; and

- BP told *The New York Times* the BOP maintenance and testing issues were solely Transocean's responsibility.  When contacted by *The New York Times*, the Company refused to comment.

128.    Then, on June 1, 2010, U.S. Attorney General Eric Holder announced that the DOJ was investigating whether criminal or civil charges were warranted under various Federal environmental statutes and other "traditional" criminal statutes, promising to hold the parties responsible for the Macondo disaster liable.

129.    As a result of *The New York Times* article and news of the DOJ investigation, Transocean's stock price declined further, closing at $50.04 on June 1, 2010 (the next trading day after the May 29, 2010 *The New York Times* article).

130.    On June 20, 2010, *The New York Times* published an article entitled "Regulators Failed to Address Risks in Oil Rig Fail-Safe Device" highlighting a previously unreleased draft report of another "industry-financed" study that contended that companies, including

48

Transocean, do not adequately test their BOPs to truly simulate the "hydrostatic pressure" faced by the equipment on the sea-floor:

> ***Often there is a great deal of pressure to run the BOP stack before it is deemed fit for purpose by the experts who maintain and test the equipment.  Pressure to cut corners can come from the operator, the drilling contractor, or it can be imagined.  Regardless of where it comes from, equipment reliability is compromised if the BOP is deployed prior to being fully tested in a manner designed to identify failures and simulate subsea conditions as closely as possible.***

(Emphasis added).

131.    The June 20 article also revealed that Transocean was aware of just how vulnerable Transocean's BOPs actually were.  *The New York Times* had secured internal documents from Transocean's files that indicated Defendants were aware BOPs in deepwater rigs had a failure rate of approximately 45% – an indication that the Company knew or should have known that BOPs required a robust preventative maintenance program to keep them in proper working order.

132.    Notably, the June 20 article also cited an industry study from 2009 indicating that the cost for halting operations to repair a BOP was approximately $700 per minute, citing this fact to call into question defendant Newman's August 5, 2009 statement (herein alleged to be false and misleading) regarding the Company's lower utilization revenue rates and purported non-systemic problems related to personnel training and maintenance failures.  Specifically, *The New York Times* questioned Newman's prior statements that the Company's fleet had experienced only a "handful of BOP problems," and that "they were anomalies" – in light of the Macondo incident and the Company's May 6 announcement regarding another BOP issue at a rig located in India.

49

133.   *The New York Times* June 20 article also provided a detailed account of modifications made by the Company and BP to the DWH's BOP that actually ***increased*** the likelihood of loss of well-control should a blowout occur:

- In 2001, when the DWH was being put into service, most subsea BOP stacks contained redundant blind shear rams ("BSRs") for added reliability.  In 2004, after redundant BSR had proven useful in sealing off a well drilled by the Company's Enterprise rig in 2003, BP and the Company decided to remove one of the BSRs to save BP money by cutting the time it took to conduct tests in late-2004;

- At the time the modifications to the BOP were made in 2004, the Company understood that it increased the Company's risk profile and demanded an indemnity clause to cover this risk (notwithstanding that the Company already had an indemnity clause with the BP);

- BP made a series of decisions designed to save BP time and money at the Macondo well, including skipping a crucial $128,000 test of the quality of the cement job sealing off the well; and

- ***The DWH's crew understood that the foregoing decisions by BP were "increasing the odds of a catastrophic blowout that only the rig's blind shear ram could stop."  The Company's crew did nothing to resist.***

(Emphasis added.)

134.   Based on this news, which revealed previously undisclosed facts concerning inadequate safety measures at the DWH that conflicted with Transocean's Class Period representations of the primacy that the Company placed on safety, the Company's share price fell $0.70 on June 21, 2010 (the next trading after publication of this article), a drop that eliminated certain gains that the Company's share price made since June 1, 2010.

135.   On July 19, 2010, Stephen Bertone ("Bertone"), Transocean's Chief Engineer aboard the DWH, provided testimony to U.S. Coast Guard Commission regarding a previously undisclosed September 2009 rig safety audit performed by BP.  During the course of his testimony, Bertone described the BP audit and that members of Transocean's senior management located at its Houston headquarters (the Company's rig asset and performance managers)

50

received a copy of the report at the time it was completed.  Bertone's testimony revealed for the first time that in September 2009, BP identified 390 preventative maintenance tasks for the DWH amounting to 3,545 man hours, which Transocean had failed to perform – a number that BP characterized as "excessive."  On this news, which again revealed that Transocean was not committed to safety as it had repeatedly claimed, the Company's share price fell $4.00 to close at $48.08 on July 19, 2010.

136.   On July 21, 2010, *The Wall Street Journal* ran an article entitled "The Gulf Oil Spill:  Supervisor Says Flaw was Found in Key Safety Device."  The article described some of the testimony provided by Ronald Sepulvado ("Sepulvado"), a BP employee overseeing certain DWH rig operations.  *The Wall Street Journal* noted that Sepulvado testified that a hydraulic leak in the BOP – a "key safety device" – was identified about **one month prior** to the Macondo incident.  *The Wall Street Journal* further noted that Transocean's continued drilling, with knowledge of the leak, may have violated federal regulations which "require companies to stop drilling if either of a blowout preventer's two control systems doesn't work properly."  *The Wall Street Journal* then juxtaposed this testimony with the fact that, although the Company continued to defend its preventative maintenance record company wide, four Transocean employees scheduled to testify before the U.S. Coast Guard Commission regarding the blowout preventer abruptly declined to voluntarily appear without explanation.

137.   On July 21, 2010, *The New York Times* published an article entitled "Workers on Doomed Rig Voiced Concern About Safety," which also revealed that Transocean's prior representations concerning the efficacy of the Company's safety protocols and comprehensiveness of its employee training was materially misleading.  In this regard, the article detailed two separate March 2010 internal reports – one on the Company's "'safety culture'"

aboard the DWH and one on the status of the DWH's equipment (the "Reports") – commissioned by Transocean that *The New York Times* secured through a FOIA request. The Reports appear to be the findings of the audit performed on behalf of the Company by Lloyd's. As disclosed by *The New York Times*, the observations and conclusions within the Reports stood in stark contrast to the project safety statements that Transocean made in its SEC filings and other public pronouncements. For example, according to *The New York Times*, the Reports:

- "showed that many [rig workers] were concerned about safety practices and feared reprisals if they reported mistakes or other problems";

- detailed the rig workers' "concerns about poor equipment reliability, 'which they believed was as a result of drilling priorities taking precedence over planned maintenance'";

- indicated that the rig workers believed that the DWH was long over-due for a dry dock maintenance overhaul: ***"At nine years old, [the DWH] has never been in dry dock . . . . We can only work around so much"***;

- quoted another rig worker as stating, "Run it, break it, fix it . . . . That's how they work";

- included a 112-page equipment assessment demonstrating that ***"many key components – including the blowout preventer rams and failsafe valves – had not been fully inspected since 2000, even though guidelines require inspection of the preventer every three to five years,"*** and cited 26 components and systems on the rig that were in "'bad' or 'poor' condition";

- noted that the rig crew was only comfortable raising project safety issues on items that could be easily resolved on the rig, and that rig crew members feared "reprisal" from the Company's onshore headquarters if they reported "actions leading to a potentially 'risky' situation";

- noted that the BOP suffered from "a range of problems including a leaking door seal, a diaphragm on the purge air pump needing replacement, and several error-response messages," and the "'extraordinary difficulties'" surrounding the maintenance of the BOP's "annulars"; and

- called into question the Company's safety testing, noting that despite the multiple known problems with the BOP's functionality, Transocean still deemed the test results "'acceptable.'"

(Emphasis added).

138.     *The New York Times* article published on July 21, 2010 also stated that this information was well-known within Transocean based upon a review of a copy of an internal September 2009 safety audit report prepared by BP.  Echoing Bertone's testimony, the article stated that when BP conducted an audit of the DWH's rig safety and maintenance, it determined that there was an "'excessive'' amount of work (390 jobs requiring more than 3,500 hours of time) left undone – despite the Company's public representations that the safety and maintenance issues aboard the DWH only manifested in the days before the incident.  As a result of the foregoing news, the Company's share price declined another $1.25 to close at $47.75 on July 21, 2010.

139.     On Friday, July 23, 2010, Michael K. Williams ("Williams"), Transocean's Chief Electrical Technician aboard the DWH, testified under oath before the U.S. Coast Guard Commission.   During his sworn testimony, Williams detailed the recurring and systemic problems relating to personnel training and maintenance failures at Transocean.  For example, Williams testified that:

- A Sperry-Sun representative retrieved a "double handful of annular" and delivered those pieces to the Company's senior subsea supervisor while Williams was in the drill shack.  Surprised, Williams asked the supervisor about the rubber pieces, which indicated excessive wear on the annular. Williams testified that the supervisor told him that it was "no big deal. That's normal."  Williams then recounted his understanding as to why the annular seal was damaged and "chunks" of rubber were coming up through the riser pipe:  a rig worked accidentally closed the annular around the drill pipe a few days prior to the chunks of rubber making their way up the surface;

- The Company ran its entire fleet with critical safety systems in "bypass mode" and no one aboard the DWH was responsible for maintaining a log of the bypassed alarms;

- Pieces of equipment on the DWH were so poorly maintained that he referred to them as "junk";

53

- A computer screen that monitored drilling operations on the DWH had been freezing with a "blue screen of death," which had been locking up for months prior to the blowout;

- As of April 2009, the DWH's fire and gas system was a "wreck," that "[t]here were several detectors that were faulted, overridden and completely ignored out of the system due to a lack of maintenance," and that Williams "took it upon [himself] to rectify" the situation;

- The DWH's safety alarms were "inhibited" the entire time he was aboard the DWH (since approximately April 2009);

- The Company's Spring 2010 Mobil Offshore Drilling Unit audit (conducted to plan out the DWH's dry dock repairs) identified numerous problems with the DWH resulting in the rig being in dry dock a "lot longer than anticipated because the rig was in very bad condition" and this simply confirmed problems that the rig crew had already identified as needing repair;[4]

- Company officials on-shore had access to and were aware of the inadequate maintenance of the DWH because of the RMS system;

- With respect to the September 2009 BP audit, Williams confirmed that BP identified Transocean's decision to run its rig with the alarms inhibited was a safety issue: "[C]ontrol of alarms and defeats and bypasses were not well managed. In fact, no single person could account for which alarms, et cetera were overridden or indeed for what reason";

- Despite the Company's public representations that it had a robust project safety culture, no one from the Company's Switzerland headquarters ever came out to the rig to discuss project safety, *i.e.*, "preventive maintenance";

- The Company's preventative maintenance program suffered from the "systemic problem" that the Company never schedules enough time to safely maintain the rig; and

- The DWH was operating with such outdated equipment that Williams would have to wait up to a year get replacement parts from non-original equipment manufacturers since the original equipment manufacturers no longer supported the equipment.

---

[4] The Chief Counsel was unable to obtain Transocean's list of repairs planned for DWH while in dry dock planned for 2011.

140.    That same day, *The New York Times* ran an article recounting Williams's testimony and disclosing previously unrevealed facts from BP's September 2009 rig safety audit entitled "Oil Rig's Siren was Kept Silent, Technician Says."  With respect to the September 2009 BP audit, *The New York Times* noted that the audit report found that the Company ignored previously-identified project safety hazards:  "Consequently, a number of the recommendations that Transocean had indicated as closed out had either deteriorated again or not been suitably addressed in the first place."

141.    *The New York Times* also recounted testimony provided that day before the U.S. Coast Guard Commission in which an engineering expert and a petroleum engineering expert called into question the adequacy of project safety training provided by the Company:

- The engineering expert testified that the Transocean rig crew "incorrectly performed a critical test of emergency equipment and did not detect a dangerous 'kick' of gas roughly an hour before the explosion"; and

- The petroleum engineering expert testified that, based upon a review of the rig crews' actions that day, the rig crew "failed to correctly test the pressure in the well."

142.    Also, on July 23, 2010, *The Wall Street Journal* published an article entitled "The Gulf Oil Spill . . . Documents Show Key Safety Switch on Deepwater Horizon Didn't Work." The article discussed previously-unreleased internal documents from Cameron (the DWH BOP manufacturer) describing the review of the DWH BOP after it was retrieved the sea-floor.  *The Wall Street Journal* discussed two critical findings by Cameron:  (i) a "deadman switch" that should have activated to seal the well once the rig lost communication with the BOP after the first explosion was inoperable, and (ii) that a second BOP "control system" had a dead battery. *The Wall Street Journal* noted that the second finding was disputed by Transocean and at odds with defendant Newman's May 28, 2010 assurances that batteries in the control pod were

adequately charged.   Based upon the foregoing news, the Company's share declined another $1.41 to close at $45.26.

143.   As a result of the disclosure of previously misrepresented and concealed material facts concerning Transocean's adherence to safety protocols and employee training, the Company's common stock price declined by $46.77 during the Class Period, dropping from $92.03 per share from April 20, 2010 up to and including July 23, 2010.   This decline resulted from disclosures of previously misrepresented material facts concerning the Company's safety culture and employee training and removed artificial inflation from Transocean's stock price, causing real economic loss of as much as $46.77 per share to investors who had purchased the Company's publicly traded securities during the Class Period and continued to hold such shares through July 23, 2010.

144.   As a result of Defendants' materially false and misleading statements, and/or omissions of material fact, Transocean securities traded at artificially inflated prices during the Class Period.   As the truth was revealed, and it became apparent that Transocean's safety mechanisms and protocols – including the critical BOP – had failed and that Transocean had not only contributed to fatalities and injuries, and been at the root of a multi-million gallon oil spill, but had also been the subject of numerous and recurring citations and investigations for poor operational and safety performance, the price of the Company's securities declined.   In a series of material steps, each decline in Transocean's stock price removed a portion of the artificial inflation from Transocean's share price.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

145.   As alleged herein, Defendants acted with scienter in that Defendants knew and/or recklessly disregarded that the public documents and statements issued or disseminated in Transocean's name were materially false and misleading; knew that such statements or

documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Transocean, their control over, and/or receipt, and/or modification of Transocean's alleged materially misleading misstatements and/or omissions, and/or their associations with the Company that made them privy to confidential proprietary information concerning Transocean, participated in the fraudulent scheme alleged herein.

**A.**     **Defendants Were Responsible for Supervising All Aspects of Project Safety Throughout the Company**

146.     At all times during the Class Period, defendants Long and Newman, in their respective tenures as Transocean's CEO, were responsible for all safety issues with the Company.  In fact, defendants Long and Newman were signatories to Transocean's "Health and Safety Policy Statement," which is one of the Company's policies regarding safety. Accordingly, Defendants were under a duty to monitor information related to the Company's project safety as a result of Defendants' positions within Transocean, and due to various statutes requiring the Company to comply with all federal regulations.

147.     For example, reflecting these critical responsibilities, 20% of defendants Newman's and Long's bonus compensation was tied to the Company's "Safety Performance" during the Class Period.  According to Transocean's 2009 Annual Report:

> ***Safety Performance.***  Our business involves numerous operating hazards and we remain committed to protecting our employees, our property and our environment.  Our ultimate goal is expressed in our Safety Vision "an incident-free workplace—all the time, everywhere."  The [Executive Compensation] Committee sets our safety performance targets at high levels each year in an effort to motivate our employees to continually improve our safety performance toward this ultimate goal.

> ***The [Executive Compensation] Committee measures our safety performance
> through a combination of our total recordable incident rate ("TRIR"), and total
> potential severity rate ("TPSR"), and through high-potential dropped objects
> ("HPDO").*** TRIR is an industry standard measure of safety performance that is
> used to measure the frequency of a company's recordable incidents and comprises
> 35% of this measure.  TRIR is measured in number of recordable incidents per
> 200,000 man hours worked.  TPSR is a proprietary safety measure that we use to
> monitor the total potential severity of incidents and comprises 35% of this metric.
> ***Each incident is reviewed and assigned a number based on the impact that such
> incident could have had on our employees and contractors, and the total is then
> combined to determine the TPSR.*** HPDO is a dropped object that has a potential
> of causing a serious injury (an injury in which the employee is out of work for six
> months or more) or a fatality.  HPDO is calculated by multiplying the mass of the
> object by the height dropped and then applying an industry standard formula to
> determine potential severity.  HPDO comprises 30% of this measure.  The
> occurrence of a fatality can override the safety performance measure.

(Emphasis added).

148.     Consistent with their responsibilities and duties, Long and Newman presided over
a February 2009 Transocean "Safety Vision Meeting" held in Mumbai and attended by all
members of the Company's senior management.   According to Transocean's Spring 2009
*Beacon* magazine, the Company's Safety Vision Meetings are held annually to "set safety goals,
and improvement plans for the new year."   Attendees of the meetings focused on "three areas
key to ensuring continued improvements in the company's safety performance:  1. Dropped
Object Prevention; 2. Integrity Management and Major Hazards; and 3. THINK Planning
Process."[5]   At this meeting, defendant Newman led discussions regarding the "formula for safe
and effective operations."

149.     Further reflecting the Individual Defendants' responsibility for ensuring
Company-wide safety and timely employee training, during the Class Period, defendant Newman
acknowledged to Transocean employees that he was personally aware of the Company's

---

[5] The Company's THINK process was one of Transocean's purported safety protocols that included the following
steps:  (i) Plan the task, (ii) identify the hazards, (iii) the likelihood and consequence of the possible incident, and
(iv) reduce the risk by applying preventative and mitigating controls.

blemished project safety performance and that he would be an integral part of supervising the

Company's safety performance.  Newman stated, in relevant part:

> First of all, we have to improve our safety performance.  You know, within 92 days last year, between June 15th and September 15th, we suffered four work-related fatalities on four of our installations.  We absolutely have to improve the effectiveness of our safety management system.  ***Whether that means modifying the system itself, or simply doing a better job of implementation, we have to improve***.  ***We cannot be a company where we suffer fatalities***.
>
> The second one is really around performance in terms of the reliability and the performance of our equipment.  Our downtime is above our targets.  Our lost revenue is above our targets.  These targets are certainly achievable.  ***We have to figure out what it is that's preventing us from achieving these targets on a consistent basis, and fix it***.
>
> (Emphasis added).

150.    During the Class Period, defendants Long and Newman were also members of

Transocean's Risk Management Committee.   As part of that Committee, the Individual

Defendants were responsible for, among other things, identifying operational risks that could

affect the Company and monitor key metrics to assess the effectiveness of the Company's risk

management:

> ***The Company also has a risk management committee composed of members of management, including the Chief Executive Officer.  The duties of the risk management committee include the following: reviewing the Company's policies and procedures regarding risk management; identifying and assessing operational, commercial, macroeconomic and geopolitical risks facing the Company; monitoring key indicators to assess the effectiveness of the Company's risk management activities; and communicating with the Audit Committee and other committees of the Board with respect to risk management.  The risk management committee conducts an annual Company-wide risk assessment and communicates the results to the Audit Committee.***  The risk management committee also updates the Audit Committee and other committees of the Board regarding risks as circumstances warrant.
>
> (Emphasis added).

151.    Additionally, the Individual Defendants' responsibility for supervising the

Company's project safety during the Class Period is further evidenced by the fact that Long and

Newman spear-headed the October 2009 "Safety-Culture" Review and were members of the Company's Steering Committee that closely interacted with Lloyd's, a third-party risk assessment organization that was retained to gather and document project safety related information from the Company's world-wide fleet of rigs. The findings of the foregoing review, to which the Individual Defendants were privy, are discussed below in ¶¶ 170-174.

152.    In addition to their responsibilities for supervising and directing project safety and personnel training at Transocean, the Individual Defendants were under a statutory duty to monitor the Company's compliance with various federal regulations. The Company operates in a heavily-regulated industry and, as such, Defendants must ensure that the Company complies with numerous federal regulations promulgated by the MMS with respect to project safety or face civil and/or criminal fines.

153.    For example, the MMS requires oil drilling companies to:

- "[P]rotect health, safety, property, and the environment by: (1) [p]erforming all operations in a safe and workmanlike manner; and (2) [m]aintaining all equipment and work areas in a safe condition" (30 C.F.R. § 250.107);

- "[M]aintain [their] BOP system to ensure that the equipment functions properly" (30 C.F.R. § 250.446(a));

- "Retain all records, including pressure charts, driller's reports, and referenced documents pertaining to BOP tests, actuations, and inspections at the facility for the duration of drilling" (30 C.F.R. § 250.450(f));

- "[K]eep complete, legible, and accurate records for each well," and "keep records relating to . . . BOP tests" for at "least two years after the completion of drilling operations" (30 C.F.R. § 250.466-.467);

- "Prior to engaging in well-completion operations, crew members shall be instructed in the safety requirements of the operations to be performed, possible hazards to be encountered, and general safety considerations to protect personnel, equipment, and the environment," and the "[d]ate and time of safety meetings shall be recorded and available at the facility for review by MMS representatives" (30 C.F.R. § 250.506);

- With respect to BOP maintenance, "ensure that the equipment functions properly"; create a detailed record of all BOP testing; "[r]etain all records including pressure charts, driller's report, and referenced documents pertaining to BOP tests, actuations and inspections at the facility for the duration of the completion activity"; and after completion of the well, retain all BOP testing records for a "period of two years" (30 C.F.R. § 250.516(h)-(i).

154. Moreover, the MMS requires companies to "ensure that [their] employees and contract personnel engaged in well control or production safety operations understand and can perform their duties." 30 C.F.R. § 250.1501. If the MMS determines that a company's training program does not comply with MMS standards, the MMS can, amongst other things, assess "civil/criminal penalties." 30 C.F.R.§ 250.1510.

155. In the Company's 2008 and 2009 Annual Reports, the Company disclosed that it monitored and complied with all existing MMS regulations and monitored for future MMS regulations that could affect the manner in which the Company conducts its business:

> Our ability to operate our rigs in the U.S. Gulf of Mexico could be restricted by governmental regulation.
>
> *          *          *
>
> ***Moreover, the MMS may issue additional regulations that could increase the cost of operations or reduce the area of operations for our rigs in the future, thus reducing their marketability***. Implementation of additional MMS regulations may subject us to increased costs or limit the operational capabilities of our rigs and could materially and adversely affect our operations in the U.S. Gulf of Mexico.
>
> (Emphasis added).

156. Thus, Defendants were under a duty to monitor the Company's project safety data to ensure that the Company was not in violation of any applicable MMS regulations or a MMS finding that the Company failed to adequately train its employees. As discussed below at ¶¶ 182-186, 189-191, Defendants failed to comply with the foregoing federal regulations during the Class Period.

157.    In addition to specific MMS regulations governing the maintenance of BOPs, the following facts informed the Individual Defendants that particular vigilance was required to ensure safe BOP operation:

- During 2000, Cameron, the DWH BOP manufacturer commissioned a safety report which revealed that the BOP was subject to "single point failure" and that it was important for the Company to properly maintain and test the BOP's hydraulic systems to ensure that the BOP would work as planned (the report was apparently produced to the Commission by Transocean);

- During 2004, Cameron issued an engineering bulletin to Defendants alerting them to the fact that the battery packs contained within the BOP control pods were subject to depletion and that they should be changed at least yearly;

- During 2002 and 2004, two industry studies, funded in part by the MMS and performed by the industry's premier authority on BOPs, West Engineering Services, found that calculations used by BOP manufacturers overestimated the cutting ability of the BSRs and that "even when everything worked right, some blind shear rams still failed to cut pipe"; and

- During 2009, the Company commissioned a "strictly confidential" reliability study on BOPs, which highlighted the delicate nature of the BOPs and the need to keep them in proper working order.

158.    Based upon those reports, Defendants knew that a robust and frequently revisited preventative maintenance program was required to ensure that the BOPs properly functioned. Based upon their admitted job responsibilities, Defendants had access to and reviewed, or had a duty to review, the Company's Global Management System ("GMS") that contained various safety and maintenance information, which indicated that the Company suffered from systemic problems related to equipment issues.

**B.** **During the Class Period Defendants Knew or Were Reckless in Disregarding Facts and Information Suggesting Their Statements Were Not Accurate**

**1.** **Defendants Had Access to and Reviewed the Company's Internal Safety Related Information**

159. During the U.S. Coast Guard Commission's investigation into the causes of the Macondo well blow-out, several Company witnesses testified as to the structure of the Company's internal information systems and that this information was networked Company wide and accessible to all employees.

160. For example, Adrian Rose ("Rose"), Transocean's VP of Quality, Health, Safety and Environment ("QHSE"), who reported directly to defendant Newman as of at least November 2009, testified about the structure of the Company's safety and maintenance information systems that generate reports for the Company's senior management.  On May 26, 2010, Rose testified, in relevant part:

- The Company's safety policies are established at the corporate level by senior management with the Company's vice presidents as the "process owners" for ensuring that policies are followed;

- Each rig develops its own rig-specific procedures in compliance with the Company's established safety policies.  These rig-specific procedures are then approved by the rig manager.  The Company maintains a fleet-wide database for task specific procedures for all rigs.  Workers on one rig can view the procedures implemented for a specific task on other rigs;

- The Company maintains a GMS, which is a networked fleet-wide electronic system for incident reporting.  The information collected in the GMS is consolidated and analyzed by a team of people from operations, engineering and QHSE at the corporate office to verify the severity rating of the incident and ensure adequate follow-up.  The GMS also contains fleet-wide information on the wells drilled by the Company, performance safety meetings, and service quality evaluations;

- As the Corporate VP of QHSE, Rose has several division QHSE directors under his direction that have direct contact with each oil rig's Rig Safety and Training Coordinator ("RSTC");

- At the Corporate level, the Company's VP of Operations is responsible for Transocean's well-control policies.  The Corporate well-control policies are maintained in a manual at "Level One" in Transocean's corporate headquarters.  The Company's VP of Performance is responsible for Transocean's standards for well drilling; and

- Transocean maintains a Safety Management System ("SMS") in accordance with International Maritime Organization Safety Management Code ("ISM").  Senior management at the corporate level have the responsibility of ensuring that the ISM requirements are met fleet-wide and that everyone on the rigs is aware of their roles under the SMS.  Additionally, the Company's senior management is responsible for the "document of compliance" inspection that ensures the Company's rigs are complying with the ISM standards.

161.    Bertone is one of Transocean's Chief Engineers assigned to the DWH since 2003.  While executing his duties as Chief Engineer, Bertone had access to the DWH's maintenance reporting system and was involved in meetings with Transocean management located at the Company's U.S. headquarters in Houston.

162.    On July 19, 2010, Bertone testified before the U.S. Coast Guard Commission regarding the flow of rig specific maintenance information to members of the Company's senior management located on-shore at the Company's Houston headquarters.  According to Bertone:

- The DWH, like the Company's other rigs, maintained an RMS.  The RMS managed all preventative maintenance work orders ("PMs") and the ordering of replacement parts;

- The RMS employed a tickler system for notifying the DWH maintenance crews that preventative equipment maintenance was required;

- PMs in the RMS were entered into Transocean's GMS under a "focus items" section and report was generated showing when PMs were due and completed;

- Bertone submitted formal reports to James Kent, Transocean's asset manager, and Paul Johnson ("Johnson"), Transocean's performance manager, (both based in Transocean's onshore Houston office) on a daily basis;

64

- In addition to Bertone's daily reports to shore, the RMS system was networked to and viewable by employees at the Company's Houston headquarters;

- Bertone received BP's September 2009 "marine assurance audit" and recalled a multi-page punchlist of deficiencies identified by BP.  Upon receipt, Bertone forwarded the punchlist to the Company's asset manager and performance manager located onshore in Houston; and

- When the Company received a list of identified preventative maintenance deficiencies from a regulatory agency, such as the Coast Guard or from a customer, such as BP, Bertone would enter the preventative maintenance work items into the RMS and GMS reporting systems and set deadlines when that work needed to be completed.

163.  Johnson, Transocean's rig performance manager for the Company's North American Division for the past 6 years, also testified before the U.S. Coast Guard Commission.  As rig performance manager, Johnson was responsible for ensuring that the Company's fleet of drilling rigs complied with the standards set by the Company's management, and that ISM Code was embedded into Transocean's management system.  Johnson testified on August 23, 2010 that he conducted daily phone calls with Transocean's off-shore rig management team in which "everything" related to the drilling rig's daily operations was discussed, including project safety.

164.  Like Rose, Bertone and Johnson, Williams, the Chief Electronics Technician, testified that the RMS was networked to the Company's on-shore headquarters.  Additionally, Williams testified that senior management from Transocean's Switzerland corporate headquarters made visits to the Company's DWH rig and discussed safety issues with him.

165.  Based upon information and belief, during their respective tenures as President, CEO and Risk Management Committee members, Long and Newman had access to and/or a duty to monitor real-time data and internal company reports contained in the GMS program that revealed the Company's systemic problems related to personnel training and maintenance failures.  As discussed more fully below at ¶¶ 166-202, as a result of the information contained

within the networked systems, Defendants either knew or were reckless in not knowing of the Company's recurring and systemic problems related to personnel training and maintenance failures contemporaneous in time to when Defendants made the disclosures alleged herein to be false and misleading.

> **2.    Defendants Received Safety Audit Reports Demonstrating Recurring and Systemic Problems Related to Personnel Training and Maintenance Failures**

166.    In addition to the various information systems available to Defendants to review and ascertain the Company's project safety information, Defendants also received information from Transocean's largest and most significant customer, BP, demonstrating that the Company was plagued by recurring and systemic problems related to personnel training and maintenance failures.

167.    For example, during September 2009, BP conducted a safety audit on the DWH that was a follow-up from a safety audit performed by BP during the first quarter of 2008. From September 13 through 17, 2009, BP's rig auditors toured the DWH and recorded certain noteworthy deficiencies related to rig maintenance, including:

- They could not verify that the Company actually performed the first quarter 2008 audit recommendations. Although Transocean's records indicated that it had closed out the prior recommendations, further review by BP auditors revealed that the previously identified deficiencies either "deteriorated again or [had] not been suitably addressed in the first instance";

- The Company's "overdue" planned maintenance was "excessive." Indeed, the DWH rig had an almost insurmountable backlog of 390 jobs amounting to 3,545 man hours. The auditors also noted that a recent shift to a new rig maintenance monitoring system indicated that the backlog would not improve any time soon;

- The BOP contained various parts that were original equipment (from at least 2001) and out of the original equipment manufacturers ("OEM") and API five year recommended recertification period; and

- A previously reported "holed hot line" had been renewed but the "boost" hose, which was "in poor fabric condition," was an original part dating back to 1999, and "clearly" not in compliance with the Company's own "yearly or 5-yearly" replacement policy.

In total, the BP auditors identified 188 deficiencies.  Thirty-one of the 188 deficiencies related to "well control maintenance," and six of the thirty-one related to BOP operation.

168.    The auditors also found that the Company "simply rejected" some of BP's audit findings with "no formal risk mitigation demonstrated," and that the Company's "recording of maintenance issues was 'substandard with missing information and poor quality reports that lacked sufficient detail to convince the reader that the task had actually been performed in accordance with procedure.'"

169.    Based upon information and belief, since BP's audit findings were entered into the Company's networked RMS and GMS safety systems and defendants Long and Newman had access to and were under a duty to monitor this information, Defendants knew or were reckless in not knowing of these systemic problems in existence by no later than September 17, 2009.

### 3.    Defendants Commissioned a "Safety-Culture" Audit Confirming Transocean Had Inadequate Safety Protocols and Personnel Training

170.    After the Company suffered four fatalities during 2009, Defendants hired an outside consultant, Lloyd's, to conduct a Company-wide survey to assess the Company's safety protocols.  An evaluation group consisting of members of Transocean's senior management and Lloyd's reported to a steering committee consisting of:  (i) Long, (ii) Newman, (iii) Rose, and (iv) Sherry Richard, Vice President, Human Resources and Information Technology.

171.    Reports made public only after the Macondo well disaster revealed that Lloyd's visited four rigs in the Company's North America division in March 2010:  the DWH; the *Marianas*; the *Discoverer Clear Leader*; and *GSF Development Driller II*.  The Safety-Culture

Review provides a vivid picture of how the Company failed to properly train its rig crews on project safety and failed to adequately maintain its equipment.

    172.    For example, Lloyd's determined that:

- "A lack of hands-on experience for workers and managers has contributed to safety concerns at the company, and a stifling bureaucracy imposed by onshore management has led to widespread resentment among rig workers."

- "[T]here was a significant level of mistrust between the rigs and the beach," 43% of employees interviewed "expressed fears of reprisals for reporting problems," and ***46% of those surveyed indicated workers were "uncomfortable with calling a 'time out for safety*.'"

- Many crew members and front-line supervisors were too readily promoted without sufficient on-the-job experience to appreciate the hazards.

- "Front-line crews are potentially working with a mind-set that they believe they are fully aware of all the hazards when it is ***highly likely*** that they are not."

- The "workload, and thus the risks, on the rigs was increasing."

- One rig crew member from the *Marianas* stated the Company ***routinely deferred preventative maintenance to boost its utilization revenue rates***: "This rig is getting $550,000 per day; unless it's a sink that needs fixing it isn't getting fixed . . . . They won't send the rig to the shipyard for major refurb that is required in certain areas."

- According to another *Marianas* crew member, the Company's safety manual was only developed to limit the Company's potential exposure to liability for project safety incidents, and not develop a culture of safety within the Company, *i.e.*, that the safety manual was "***written for the courtroom, not the oil field***."

    (Emphasis added).

    173.    From March 12 to 16, 2010, Lloyd's surveyed crew members on the ill-fated DWH by conducting one-on-one interviews of approximately 40 employees.  Lloyd's found that:

- Workers believed that teamwork on the rig was effective, but they were mostly worried "about the reaction of managers off the rig."

- Only about half the workers on the DWH interviewed felt they could report actions leading to a potentially "risky situation" without reprisal from the Company's on-shore headquarters in Houston.

- On the DWH, workers said "company plans were not carried out properly and that they 'often saw unsafe behaviors on the rig.'" Lloyd's quoted one employee as stating that the "company is always using fear tactics . . . . All these games and your mind gets tired."

- "[N]early everyone" interviewed believed that the Company's system for tracking health and safety issues [(known as "START" – See, Think, Act, Reinforce, Track)] on the rig was "counter productive."

- Workers voicing concern "about poor equipment reliability," which they attributed to the Company's practice of permitting "drilling priorities" to take "precedence over planned maintenance." As described by one employee, "Run it, break it, fix it . . . . That's how [Transocean] work[s]."

- Many critical items, including blowout preventers and failsafe valves, had not been fully inspected since the DWH went into service in 2001 – notwithstanding that the manufacturer's guidelines for certification required that the equipment be recertified every three to five years.

- On the DWH, there were "dozens" of *cited equipment deficiencies "as 'critical equipment items that may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment.'"*

- The DWH workers cited 26 components and systems on the DWH rig that were in "poor" or "bad" condition.

- Transocean's failure to provide training in proper project safety led to employees using substandard parts and procedures to conduct repairs.

- Lloyd's credited the DWH's malfunctioning pressure gauge and leaking parts to the decision by workers to use a type of sealant "proven to be a major cause of pump bearing failure."

(Emphasis added).

174.    A laundry list of problems with respect to the DWH's BOP was identified by

Lloyd's audit, including:

- "[C]ontrol panels in fair condition";

- A "leaking door seal, a diaphragm on the purge air pump needed replacement and several error-response messages"; and

- The device's annulars, which are large valves used to control wellbore fluids, encountered "'extraordinary difficulties' surrounding their maintenance."

Despite these foregoing problems, Lloyd's noted that the Company found that the multiple pressure tests taken of the BOP's annular preventers and rams were deemed "acceptable." These findings were reflected in BP's rig safety audit of the DWH conducted in September 2009, indicating deficiencies in Transocean's equipment maintenance programs.

175.   Defendants either knew of, or were reckless in disregarding, these long outstanding preventative maintenance issues which were confirmed by Lloyd's findings.

> **4.    Defendants Knew or Recklessly Disregarded Information Revealing Systemic Problems Related to Equipment Maintenance, Particularly BOPs**

176.   Internal Transocean documents show that BOPs in deepwater rigs had a failure rate of 45% – an indication that the Company knew that BOPs required a robust preventative maintenance program to keep them in proper working order.

177.   Given the high failure rate for BOPs, Transocean utilizes many internal reports putatively intended to document and track rig maintenance activities and issues, such as "Transocean Daily IADC Reports" and the "Subsea Daily Activity Summary Report." Based upon information and belief, these reports provided the Company's offshore and onshore management, including defendants Long and Newman, with information concerning daily performance of equipment maintenance and testing – and the fact that preventative maintenance was not being performed as "needed."

178.   BP's investigation team reviewed the aforementioned reports after the Macondo incident to ascertain the maintenance and testing history of the DWH BOP. Although BP's

investigation team determined that the Company complied with federal regulations and Company standards for BOP installations, the BP team found that *once the rig was in operation*, the Company apparently abandoned its own policy.

179. For example, the Company's maintenance policy required that "all BOP emergency back-up systems (defined as EDS, AMF, autoshear, ROV intervention and any other control systems such as acoustic, if available) be tested on the surface prior to subsea deployment of the BOP" at a well-site. A review of the daily reports by BP's investigation team, however, found no indication that the "AMF and ROV intervention functions were tested on the surface prior to the BOP's deployment on the Macondo well." The Chief Counsel's Report confirmed this finding.

180. Additionally, based upon its review of internal Transocean documents after the DWH explosion, BP's investigation team identified the following maintenance related issues that had the "potential to adversely impact the performance of the BOP system":

- BOP maintenance records "were not accurately reported in the maintenance management system." Examples of inaccuracies include "[r]ecords of work being performed on the BOP when the BOP was installed subsea and not accessible," and "[n]ot recording complete tracking of specific individual components";

- The Company's battery maintenance records from 2001 to 2010 demonstrate that "during this 9-year period, the batteries were changed with less than the recommended frequency of once per year." Significantly, "[i]n November 2007, the subsea daily activity report recorded that 'all batteries are dead' in the blue pod when the BOP was retrieved to the surface";

- There were no indications that the AMF and the ROV intervention systems were tested at the surface, as required by Transocean testing policy, prior to subsea deployment on the Macondo well; and

- "The diagnostic systems did not appear to have been utilized effectively in all cases to identify and remedy defects in critical components. Solenoid valve coil faults and hydraulic system leaks probably existed on the BOP prior to the accident."

71

181.     BP's own internal documents also reveal systemic problems at Transocean.  For example, BP's documents "show that in March [2010], after problems on the rig that included drilling mud falling into the formation, sudden gas releases known as 'kicks' and a pipe falling into the well, BP officials informed federal regulators that they were struggling with loss of well control," and that on "at least three occasions" prior to the blow-out, BP identified that the Company's BOP was "leaking fluid."

182.     Like BP, the Chief Counsel's Report also found that Transocean failed to maintain its equipment according to maintenance information available to Defendants during the Class Period.  For example, in 2004, Cameron, the DWH BOP manufacturer, issued an engineering bulletin to Transocean and Cameron's other customers specifically "recommending that battery banks be replaced after one year of operation, or when the number of actuations exceeds 33 for that year, whichever comes first."

183.     Despite this explicit warning, Transocean's internal maintenance records from 2001 through 2010 indicate that the "AMF batteries were changed at a frequency less than the manufacturer's recommendation," and that the Company's AMF diagnostic testing procedure did not include measuring the charge on the AMF batteries.  The Chief Counsel's Report also determined that the Company "did not adequately maintain and replace its BOP pod batteries," which violated Cameron's recommended maintenance protocol as well as the Company's own preventative maintenance policy calling for "yearly inspection of batteries."

184.     In April 2010, Transocean issued a ModuSpec rig condition assessment, which stated that all three pods had new batteries installed.  Upon comparing this record with other internal Company records, the Chief Counsel's Report determined that the DWH crew "had not replaced the batteries on one pod for two-and-a-half years prior to the Macondo blowout and had

72

not replaced the batteries in another pod for a year." This discrepancy was indicative of systemic problems with the Company's equipment maintenance program, as the Chief Counsel's Report determined, after a review of Company records, that the DWH rig personnel "found all of the batteries in one [DWH] BOP pod dead in November 2007."

185.    Further, MMS regulation 30 C.F.R. § 250.446 requires drilling operators to recertify BOPs every three to five years to ensure that they are in proper working order for deepwater deployment.   According to the Chief Counsel's Report, recertification of the BOP involves "complete disassembly and inspection of the equipment" of the BOP on the surface, and can take "90 days or longer" to complete.  Despite this clear government requirement for the safe and effective operation of the BOP, the Chief Counsel's Report found that several parts of the BOP were "original and had not been recertified within the past five years."   The Chief Counsel's Report attributed this failure to the Company's "misguided" condition-based Subsea Maintenance Philosophy, which dictated that the Company simply "track the condition of the BOP in the [RMS]," and only make repairs if the crew "feel[s] that the equipment is beginning to wear" – a maintenance program that knowingly "second-guessed manufacturer recommendations, API recommendations, and MMS regulations."

186.    The Chief Counsel's Report made several other findings, based upon a review of internal documents, that were critical of the Company's preventative maintenance procedures that were in existence and known to Defendants during the Class Period.  Among other things, the Commission made the following findings:

- Transocean employees did not adequately maintain or replace BOP pod batteries on the DWH;

- Transocean's practice of destroying test records for BOPs at the end of each well's lifetime undermines adequate BOP maintenance;

- Transocean's Rig Management System was ineffective as it was a "work in progress" at the time of the DWH disaster.  For example, preventative maintenance orders were often disorganized, erroneous, or irrelevant to individual rig crews;

- Transocean may not have conducted proper onshore maintenance of its rigs because of a concern over lost daily operating rate fees; and

- Transocean employees made biased decisions leading up to the DWH disaster in favor of cost and time savings while increasing the risk of a blowout.

187.   In addition to the Chief Counsel Report's findings, on July 23, 2010, Williams testified under oath before the U.S. Coast Guard Commission as to the systemic problems relating to equipment failures plaguing the Company during the Class Period that Defendants either knew or were reckless in not knowing:

- The Company ran its entire fleet with critical safety systems in "bypass mode" and no one aboard the DWH was responsible for maintaining a log of the bypassed alarms;

- Pieces of equipment on the DWH were so poorly maintained that he referred to them as "junk";

- As of April 2009, the DWH's fire and gas system was a "wreck,"  that "there were several detectors that were faulted, overridden and completely ignored out of the system due to a lack of maintenance," and that Williams "took it upon [himself] to rectify" the situation;

- The DWH's safety alarms were set "inhibited" the entire time he was aboard the DWH (since approximately April 2009);

- The Company's Spring 2010 MODU audit (conducted to plan out the DWH's dry dock repairs) identified numerous problems with the DWH resulting in the rig being in dry dock a "lot longer than anticipated because the rig was in very bad condition" and this it simply confirmed problems that the rig crew had already identified as needing repair;

- Company officials on-shore had access to and were aware of the inadequate maintenance of the DWH due to the RMS system;

- With respect to the September 2009 BP audit, Williams confirmed that BP identified Transocean's decision to run its rig with the alarms inhibited as a safety issue:  "[C]ontrol of alarms and defeats and bypasses were not

well managed.  In fact, no single person could account for which alarms, et cetera were overridden or indeed for what reason";

- The DWH was operating with such outdated equipment that Williams would have to wait up to a year get replacement parts from non-OEM manufactures since the original equipment manufacturers no longer supported the equipment.

188.   Thus, at the time of the Macondo well blowout, Transocean was operating the DWH in violation of government regulations and contrary to manufacturer maintenance recommendations.  Given Defendants' duty to monitor this crucial safety related information, Defendants knew or were reckless in not knowing of the systemic issues surrounding the Company's failure to conduct preventative maintenance.

### 5.   Defendants' Internal Documents Reveal Systemic Problems Related to Inadequate Safety Training

189.   Despite suffering a near-miss in December 2009 in the North Sea, Transocean failed to share critical information learned from the Company's experience prior to the Macondo blowout with its fleet, and particularly the DWH.  Discounting Transocean's claim that the North Sea incident was unlike the circumstances found at the Macondo well, the Chief Counsel's Report found the incident identical in "crucial aspects":

- The rig crew underbalanced the well while displacing mud to sea water;

- A successful negative pressure test "blinkered" the crew and produced an improper "change in mindset";

- The crew conducted displacement operations in ways that inhibited pit monitoring; and

- The crew discounted kick indicators by attributing them to other occurrences on the rig.

190.   The Chief Counsel's Report found that Transocean:

Failed to effectively share and enforce the lessons learned from that event with all relevant personnel.  The company held two conference calls and distributed an advisory for its North Sea personnel only.  It also posted a short advisory about

the event on its electronic documents platform – *accessible fleetwide* – but it did not alert crews of the advisory's existence. Indeed, there is no evidence that anyone on or affiliated with the Deepwater Horizon knew of the North Sea incident or read any of its lessons prior to the Macondo blowout.

(Emphasis added).

Even though Defendants recognized that this near miss was an excellent training tool, Defendants failed to properly disseminate this safety training info.

191. The Chief Counsel's Report also found the following deficiencies related to the Company's project safety training program:

- Transocean did not adequately train its employees with respect to "kick" detection and diagnosis during end-of-well, nondrilling activities, such as temporary abandonment. Specifically, the Commission concluded that the evidence demonstrated that Transocean employees failed to recognize signs of a "kick" on the DWH that would have been detectable by a skilled industry observer, even after shutting down operations to investigate a well irregularity;

- Transocean did not properly train its employees in how to perform or interpret a "negative pressure test";

- Transocean did not properly train its employees with respect to "well monitoring," as its employees permitted and engaged in simultaneous operations on the DWH that precluded adequate monitoring and kick detection;

- Transocean did not properly inform its employees of the objectives, procedures and hazards associated with riser displacement operation;

- Transocean did not properly share, update, or train employees with information from prior Company incidents and "near-misses"; and

- Transocean did not properly train its employees regarding how to respond to emergency well control situations such as when a "kick" or severe blowout occurs, since its well control drill training did not focus on how to recognize an emergency and what steps to take immediately upon recognizing it.

192. Along with the North Sea incident, internal documents available only to Defendants during the Class Period but uncovered during the investigations that followed the Company's loss of well-control at the Macondo site further demonstrate that Company employees were not trained to follow the limited procedures that the Company had in effect.

193.   For example, between June 15 and September 15, 2009, the Company suffered four fatalities.  One of the four fatalities occurred on the *Cajun Express*, a drillship contracted by Repsol E&P USA Inc. and operating in the Gulf of Mexico.  The fatality occurred on September 3, 2009 while the *Cajun Express* was conducting cement plug and abandonment operations similar to those being performed on the DWH at the time of the loss of well-control. During the course of these tasks on the *Cajun Express*, a pipe handler operator did not signal that he was undertaking a task that could result in injury to his co-workers, and did not check to see if the pipe handler spotter was in harm's way while "tubulars" were being relocated on the rig.  As a result, he suffered a fatal blow to the head.

194.   The very next day, the MMS commenced an investigation into the events leading up to the fatality.  At the same time, Transocean and Repsol senior management conducted fourteen interviews of rig crew with relevant information.  The MMS investigators combined their notes with the information gathered by the Company's internal investigation to reach its conclusion that the Company's failure to adequately train its employees was a contributing factor to the cause of the incident.  The MMS report, issued in February 2010, found numerous deficiencies with Transocean's safety training policies that were in existence as early as May 2009 but no later than September 3, 2009, including:

- The Company failed to provide a "more formalized" training program that actually identified the hazards associated with the operation of the pipe handler device.

- Training consisted mostly of "on-the-job training with little to no classroom/textbook training."

- The pipe handler certification test consisted of 16 "fill-in-the-blank, multiple choice, and true-false questions," an astoundingly unchallenging aspect of the certification test – the study guide was exactly the same as the test except the test did not include the answers.  A rig crew member needed only to memorize the answers and fill-in the blanks.

- After searching Company records and interviews, the MMS could not locate any evidence of a formalized training program that incorporated a "hazard analysis."

- The MMS found operational risks were not "being reduced to as low as reasonably practicable."

- The Company's safety policies requiring a "THINK Planning process" were not followed.

- Rig workers failed to utilize "Transocean Prompt Cards" to ensure effective written and verbal THINK plans are created for the project task to be performed.  Rig supervisors were unable to demonstrate a clear understanding of how to utilize the Prompt Cards.

- Of the rig crew members interviewed, none could demonstrate the correct use of the Prompt Cards.

- The Company performed an internal rig Performance and Monitoring Audit and Assessment in May 2009 and identified an "opportunity for action improvement by the effective use of Prompt Cards," but there was "no documentation to demonstrate the action improvement opportunity was followed."

195.    The MMS report was based entirely upon information available to the Company and the Individual Defendants.  The findings lay bare Defendants' representations concerning Transocean's putatively vigilant safety protocols and personnel training.

### 6.    Defendants Knowingly Made a Series of Decisions that Increased the Risk of Loss of Well Control

196.    When Transocean acquired the DWH in 2001, the Company equipped the DWH with a BOP that could accommodate two BSRs.  Until 2004, the DWH BOP contained two BSRs.  On October 11, 2004, however, BP requested that the Company remove the second BSR and install a "test-ram" to save BP time and money by reducing well testing time.  Appeasing BP while sacrificing human and environmental safety, Transocean acquiesced to BP's request.  At the time, Transocean noted that the modification would "reduce the built-in redundancy" of the BSRs and raise the Company's "risk profile."  As a result, Transocean demanded that BP sign a

"Letter Agreement" that required BP to indemnify Transocean since the Company was aware that this decision increased the likelihood of loss of well control.

197.    Additionally, the Company routinely tested the DWH BOP at much "lower pressure" than ordinary, not effectively simulating conditions the BOP would face on the sea floor.  Based upon information and belief, since the Company's pressure testing was required to be maintained pursuant to MMS requirements, and this crucial safety testing information was entered into the Company's RMS, Defendants had access to this information demonstrating that the results of critical pressure tests were unreliable.

### 7.    Regulators Notified Transocean of Systemic Safety Issues with Its Policies and Equipment

198.    Prior to and during the Class Period, the Company received numerous notices from governmental regulatory agencies from around the world that repeatedly flagged systemic problems related to personnel training and maintenance failures at Transocean.

199.    For example, since 2005, the MMS has investigated four fires aboard deepwater drilling rigs.  In all four cases, the rigs were operated by Transocean.  In September 2009, a fire broke out aboard the Company's *Discoverer Clear Leader* rig.  The fire was deemed a "serious situation" since it knocked out power to the thrusters that kept the rig positioned over the well-site.  Likewise, nearly three of every four incidents that triggered federal investigations into safety and other problems on deepwater drilling rigs in the Gulf of Mexico since 2008 have been on rigs operated by Transocean, according to an analysis of federal data performed by *The Wall Street Journal* and published May 10, 2010 that the Company did not dispute.

200.    The MMS also documented an issue with a BOP failure on the Company's *Enterprise* rig during February 2006.  While drilling another well for BP, a gauge on the *Enterprise* suggested a leak coming from the BOP.  One unmanned submarine attempted to shut

down the well, but lacked enough hydraulic fluid to add to the valve.  As a result, a second unmanned submarine was sent down and eventually shut down the well five hours after the leak was discovered and after approximately 54 barrels of fluid spilled into the Gulf.  Notably, when pressed for answers by *The Wall Street Journal*, the Company refused to comment on the MMS' finding that the leak was caused, in part, by the Company's "***extended use of the BOP without inspection/maintenance.***"

201.    Safety inspections performed by various governmental bodies also informed Defendants that the maintenance issues experienced with the DWH's BOP were systemic and widespread.  For example, from April 23, 2009 to May 7, 2009, the Petroleum Safety Authority Norway ("PSA") performed an audit of the Company's Searcher rig located in the Gjoa field (in the North Sea).  In June 2009, the PSA issued a report that identified eight nonconformities in relation to regulatory requirements, including "competence and training," "internal verification and follow-up activities," and "monitoring in the control room," and two areas needing improvement, including "maintenance."  PSA found that the Company's failure to adhere to the minimum safety and preventative maintenance standards was deeply-rooted and widespread.

202.    In addition to the PSA's findings, other countries' safety audit findings reveal systemic problems arising from a lack of training and the failure to conduct required preventative maintenance and safety testing:

| Date | Location | Rig Name | Act or Regulation Violated | Reviewing Authority and Comments |
|------|----------|----------|----------------------------|----------------------------------|
| 11/14/2001 | Scotland | Transocean Sedco 704 | Lifting Operations and Lifting Equipment Regulations 1998; Health and Safety At Work Act 1974; Management of Health & Safety at Work Regulations 1999 | **Aberdeen City UA Scotland Health, Safety and Environment ("HSE") Enforcement Notices:** Failure to provide a safe, risk-free environment for the testing and maintenance of the column personnel elevators. |
| 10/1/2002 | Scotland | Transocean Shelf Explorer | Health and Safety At Work Act 1974; Provision and Use of Work Equipment Regulations 1998 | **Aberdeen City UA Scotland HSE Enforcement Notices:** Failure to provide an effective system to ensure that deteriorating equipment does not result in a dangerous situation. |
| 6/5/2004 | Scotland | Transocean John Shaw | Health and Safety At Work Act 1974 | **Aberdeen City UA Scotland HSE Enforcement Notices:** Failure to ensure health, safety and welfare of employees and persons not employed by Transocean. |
| 8/10/2004 | Scotland | Transocean Sedco 711 | Offshore Prevention of Fire | **Aberdeen City UA Scotland HSE Enforcement Notices:** Failure to provide an operational emergency acoustic signal. |

| Date | Location | Rig Name | Act or Regulation Violated | Reviewing Authority and Comments |
|---|---|---|---|---|
| 3/15/2005 | Gulf of Mexico | Transocean Amirante | | **U.S. Dept. of the Interior ("USDI"), MMS, Gulf of Mexico Region, Accident Investigation Report:** "[U]nplanned BOP riser disconnect" during BOP testing operations; rigged temporary system to test pods "to avoid time and safety issues"; function test of Vetco H-4 wellhead connector took "unusually long . . . crew did not wait for the entire test to complete to verify its proper function." |
| 9/8/2005 | Scotland | Transocean John Shaw | Health and Safety At Work Act 1974 | **Aberdeen City UA Scotland HSE Enforcement Notices:** Failure to provide training and supervision to deck lifting personnel. |
| 1/26/2006 | Gulf of Mexico | Transocean Deepwater Horizon | | **USDI, MMS, Gulf of Mexico Region, Accident Investigation Report:** Drill casing separated due to improper installation of anti-rotation slot keys; not all casing joints were recovered; 306 feet of casing lost; work performed by Dril-Quip Service Tech, Weatherford casing crew, and rig crew. |
| 3/10/2006 | Scotland | Transocean Sedco 714 | Health and Safety At Work Act 1974; Offshore Design and Construction | **Aberdeen City UA Scotland HSE Enforcement Notices:**  Failure to timely ensure the integrity of the deballast pump upon removal of a secondary pump. |
| 6/9/2006 | Scotland | Transocean Sedco 712 | Provision and Use of Work Equipment Regulations 1998; Health and Safety At Work Act 1974 | **Aberdeen City UA Scotland HSE Enforcement Notices:**  The multi-purpose BOP pressure testing tool was unsuitable for the purpose for which it was used resulting in failure and exposed safety risks. |

82

| Date | Location | Rig Name | Act or Regulation Violated | Reviewing Authority and Comments |
|---|---|---|---|---|
| 6/28/2006 | Scotland | Transocean Sedco 704 | Management of Health & Safety at Work Regulations 1999; Provision and Use of Work Equipment Regulations 1998 | **Aberdeen City UA Scotland HSE Enforcement Notices:** Risk assessment associated with "Tripping the BHA [Bottom Hole Assembly]" was insufficient and unsuitable. |
| 10/12/2006 | Scotland | Transocean Sedco 712 | Health and Safety At Work Act 1974; Management of Health & Safety at Work Regulations 1999 | **Aberdeen City UA Scotland HSE Enforcement Notices:** Failure to provide suitable risk assessment for maintenance activities. |
| 3/30/2007 | Scotland | Transocean Sedco 706 | Provision and Use or Work Equipment Regulations 1998; Health and Safety AT Work Act 1974 | **Aberdeen City UA Scotland HSE Enforcement Notices:** Failure to ensure that the auxiliary hoist was maintained efficiently and in good repair. |
| 8/24/2008 | Scotland | Transocean Rather | Offshore Prevention of Fire | **Aberdeen City UA Scotland HSE Enforcement Notices:** Failure to ensure that the Driller's remote BOP control panel was maintained and in good repair. |
| 9/20/2008 | Gulf of Mexico | Transocean Discoverer Deep Seas | | **USDI, MMS, Gulf of Mexico Region, Accident Investigation Report:** "[A] seal on the Lower Blind Shear Ram (LBSR) failed" while displacing the BOP stack with Synthetic Base Mud; "the standard operating practice to balance the pressure on both sides of a valve before opening was not conducted." |

203.    Based upon the information available to them, Defendants knew or recklessly disregarded that the Company suffered from systemic problems related to personnel training and maintenance failures when they issued the statements alleged herein to be false and misleading.

## VII.    LOSS CAUSATION

204.    The material misrepresentations and omissions detailed above had the effect of creating and maintaining artificially inflated prices for Transocean securities throughout the Class Period.  Lead Plaintiff and other Class members purchased Transocean securities at prices artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein.  Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the prices of Transocean securities served to maintain the prices of Transocean securities at artificially inflated levels.

205.    Defendants' materially false and misleading statements in conference calls, SEC filings and other public statements during the Class Period proximately caused Lead Plaintiff and the Class to suffer losses and damages when previously misrepresented and concealed material facts were gradually disclosed.

206.    The prices of Transocean securities declined in direct response to partial disclosures of previously misrepresented and/or concealed material facts.    Specifically, Defendants' and market observers' gradual revelation of the truth concerning:  (i) Transocean's business and operations; (ii) the quality and effectiveness of the Company's putative safety protocols and personnel training; (iii) Transocean's responsibility for the DWH disaster and its containment; and (iv) the Company's exposure to losses resulting from the DWH disaster, removed portions of the artificial inflation in the prices of Transocean securities.

## VIII.   GROUP PLEADING

207.   The Individual Defendants are liable for the materially false and misleading statements pleaded herein that were issued by, in the name of, or sponsored by Transocean. Each of those statements was "group-published" information, and was the result of the collective actions of the Individual Defendants, each of whom was intimately involved in Transocean's day-to-day operations.

208.   The Individual Defendants were involved in drafting, reviewing and/or disseminating the materially false and misleading statements issued by Transocean and approved or ratified those statements, and, therefore, adopted them as their own. Accordingly, it is appropriate to treat the Individual Defendants as a group for pleading purposes.

## IX.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

209.   At all relevant times, the market for Transocean's publicly traded securities was an efficient market for the following reasons, among others:

(a)   Transocean's common stock was listed and actively traded on the NYSE, a highly efficient national market, with 319,993,000 shares issued and outstanding and public trading float of 319,446,000 shares as of the end of the Class Period;

(b)   As a registered and regulated issuer of securities, Transocean filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;

(c)   Transocean regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services;

(d)   Transocean was followed by several different securities analysts employed by major brokerage firms, including Wells Fargo, Credit Suisse, and RBC Capital Markets, which followed Transocean's business and wrote reports that were distributed to the sales force and customers of their respective

brokerage firms.  Those reports were publicly available and affected the public marketplace;

(e)   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Transocean securities; and

(f)   Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Transocean securities between the time that Defendants made the material misrepresentations and omissions and the close of the Class Period, during which time the price of Transocean securities was artificially inflated by Defendants' misrepresentations and omissions.

210.   As a result of the above, the market for Transocean securities promptly digested current information with respect to the Company from all publicly-available sources and such information was reflected in the prices of the Company's securities.  Under these circumstances, all purchasers of Transocean securities during the Class Period suffered similar injuries by purchasing Transocean securities at prices that were artificially inflated by the Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## X.   THE STATUTORY SAFE HARBOR IS INAPPLICABLE

211.   As alleged herein, Defendants acted with scienter because at the time that they issued public documents and other statements in Transocean's name, they knew or recklessly disregarded the fact that such statements were materially false and misleading or omitted material facts.  Moreover, Defendants knew that such documents and statements would be issued or disseminated to the investing public; knew that persons were likely to rely upon the misrepresentations and omissions of material fact in such statements and documents; and knowingly and/or recklessly participated in the issuance and/or dissemination of such statements and documents as primary violators of the federal securities laws.

212.   As set forth in detail in this Complaint, Defendants, by virtue of their job responsibilities, and their control over and/or receipt of Transocean's materially misleading

statements, were informed of, participated in and knew of the fraudulent scheme alleged herein. With respect to non-forward looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

213.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements and material omissions pled in this Complaint.  The statements alleged to be materially false and misleading were not specifically identified as "forward-looking statements" when made, and were statements of historical fact and/or representations about the Company's then-existing condition to which the statutory safe harbor does not apply.

214.    To the extent any statements alleged to be false or misleading herein may be deemed forward-looking:  (i) those statements were not accompanied by meaningful cautionary statements identifying the important and currently known factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (ii) the particular speakers of such statements actually knew in each case that their statements were materially false or misleading and/or the statements were authorized and/or approved by an executive officer of the Company who actually knew that such statements were materially false or misleading.

## XI.    CLASS ACTION ALLEGATIONS

215.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or otherwise acquired Transocean securities during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and

their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

216.    The members of the Class are so numerous that joinder of all members is impracticable.  There were approximately 319.93 million shares of Transocean common stock outstanding and actively trading on the NYSE as of April 27, 2010, according to the Company's Form 10-Q filed with the SEC on May 5, 2010.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Transocean or its transfer agent, and they may be notified of the pendency of this action by mail, as is customary in securities class actions.

217.    Questions of law and fact common to the members of the Class predominate over questions that may only affect Class members individually, including:

(a)    whether Defendants violated the federal securities laws, as alleged herein;

(b)    whether Defendants' statements during the Class Period misrepresented and/or omitted material facts concerning, among other things, Transocean's safety protocols and personnel training;

(c)    whether Defendants knew or recklessly disregarded that their statements were materially false and misleading and/or omitted material facts;

(d)    whether the prices of Transocean securities were artificially inflated during the Class Period; and

(e)    Whether Defendants caused Class members to suffer damages.

218.     Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class purchased Transocean securities at artificially inflated prices and sustained damages caused by Defendants' wrongful conduct.

219.     Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class action litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

220.     Joinder of all Class members is impracticable, and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as it is likely that the damages suffered by certain individual Class members may be relatively small, the expense and burden of individual litigation would make it impossible for each member of the Class to individually redress the wrongs done to him or her.  There will be no difficulty managing this action as a class action.

## XII.    CAUSES OF ACTION

### COUNT I
### Violation Of § 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder

221.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This claim is asserted against all Defendants.

222.     During the Class Period, Transocean and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and did:  (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market prices of Transocean's securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Transocean's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

223.    While in possession of material adverse, non-public information, Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Transocean's securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons, as alleged below in Count II.

224.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01 et seq.) and Regulation S-K (17 C.F.R. Section 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations so that the market price of the Company's securities would be based on truthful, complete and accurate information.

225.    Transocean and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal adverse

material information about the business, operations and future prospects of Transocean as specified herein.

226.    Each of the Individual Defendants was authorized to make public statements, and made public statements during the Class Period, on Transocean's behalf, and each Individual Defendant was privy to and participated in the creation, development and issuance of the materially false and misleading statements alleged herein, and/or was aware of the Company's and other Defendants' dissemination of information to the investing public that they either knew, or recklessly disregarded, was materially false and misleading.

227.    By virtue of their high-level positions at the Company during the Class Period, and their responsibilities for maintaining and monitoring Transocean's safety protocols and personnel training, each Individual Defendant was privy to and participated in the creation, development and reporting of the Company's safety and personnel training plans, projections and/or reports and had access to, and a duty to monitor, internal reports and other data and information about the Company's operations at all relevant times.

228.    The Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to monitor, ascertain, or disclose such facts, even though such facts were available to them and they had a duty to monitor, ascertain and report the truth.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing material information pertaining to, among other things, Transocean's operating condition, safety protocols, personnel training, and future business prospects from the investing public and supporting the artificially inflated prices of the Company's securities.

229.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Transocean's securities was artificially inflated throughout the Class Period.  In ignorance of the fact that the market prices of Transocean's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Transocean securities during the Class Period at artificially inflated prices and were damaged when the truth was gradually revealed and the prices of Transocean securities declined.

230.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known of the safety and training inadequacies at the Company, which were misrepresented and not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Transocean securities; or, if they had purchased or otherwise acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

231.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

232.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### Violation of § 20(a) Of The Exchange Act

233.    Lead Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.  This claim is asserted against the Individual Defendants.

234.    The Individual Defendants acted as controlling persons of Transocean within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's day-to-day operations, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements and SEC filings that Lead Plaintiff alleges are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

235.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Transocean and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

236.    As set forth above, Transocean and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint and,

therefore, each culpably participated in the fraudulent conduct alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

a. Declaring that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying the Class with Lead Plaintiff as Class Representative, and certifying Lead Plaintiff's counsel as Class Counsel;

b. Awarding Lead Plaintiff and the other members of the Class compensatory damages against Defendants, jointly and severally, together, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees, experts' fees and other costs and disbursements; and

d. Awarding Lead Plaintiff and the other members of this Class such other and further relief as the Court may deem just and proper.

## XIV.  DEMAND FOR TRIAL BY JURY

Lead Plaintiff demands a trial by jury.

Dated: <u>March 18, 2011</u>

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

By:    *Hah R*

       Hannah Greenwald Ross
       Justinian Doreste
       1285 Avenue of the Americas
       New York, NY 10019
       Tel: (212) 554-1400
       Fax: (212) 554-1444

*Liaison Counsel for Lead Plaintiff*
*Danica Pension A/S*

BARROWAY TOPAZ KESSLER
  MELTZER & CHECK LLP
Darren J. Check
Gregory M. Castaldo
Karen E. Reilly
Johnston de F. Whitman, Jr.
Mark S. Danek
Neena Verma
280 King of Prussia Road
Radnor, PA  19087
Tel: (610) 667-7706
Fax: (610) 667-7756

*Lead Counsel for Lead Plaintiff*
*Danica Pension A/S*

95

# EXHIBIT A

## AMENDED CERTIFICATION OF JESPER HJETTING
## ON BEHALF OF DANICA PENSION

Danica Pension A/S ("Danica" or "Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.      Danica did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      Danica is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Attached in Schedule A are Plaintiff's common stock transactions in Transocean Ltd. (NYSE: RIG) during the Class Period.

4.      Danica has full power and authority to bring suit to recover for investment losses on behalf of itself and its funds.

5.      Danica has fully reviewed the facts and allegations of the Consolidated Class Action Complaint and has authorized its filing.

6.      I, Jesper Hjetting, Senior Vice President of Danica, am authorized to make legal decisions on behalf of Danica.

7.      Danica intends to actively monitor and vigorously pursue this action for the benefit of the class.

8.      Danica will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

9.      On July 5, 2010, Danica signed a certification (the "July 5 Certification") stating that it has not served or sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification. The July 5 Certification was filed with the United States District Court for Southern District of New York on July 12, 2010. *See* Johnson Investment Counsel Inc. v. Transocean Ltd. et al., 1:10-cv-04515-NRB, Dkt. 10. Since July 5, 2010, Danica has not served or sought to serve as a representative party for a class action filed under the federal securities.

10.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs

1

and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of March, 2011.

Danica Pension A/S

By: _____

Jesper Hjetting
Senior Vice President

2

**Schedule A**

| Security | Buy/Sell | Date | Shares | Price |
|----------|----------|------|--------|-------|
| Com Stk | Buy | 11/6/2009 | 3,233 | $85.40 |
| Com Stk | Buy | 12/18/2009 | 2,000 | $83.97 |
| Com Stk | Buy | 3/31/2010 | 79,500 | $85.62 |
| Com Stk | Buy | 3/31/2010 | 3,500 | $86.38 |
| Com Stk | Buy | 4/7/2010 | 5,100 | $87.88 |
| Com Stk | Buy | 4/7/2010 | 22,400 | $87.95 |
| Com Stk | Sell | 6/11/2009 | 5,350 | $84.25 |
| Com Stk | Sell | 4/29/2010 | 1,100 | $81.52 |
| Com Stk | Sell | 5/24/2010 | 7,300 | $58.36 |
| Com Stk | Sell | 5/28/2010 | 34,500 | $57.26 |
| Com Stk | Sell | 6/1/2010 | 75,600 | $51.45 |