UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
DONALD P. FOLEY, on behalf of himself
and all others similarly situated,

                              Plaintiff,        **MEMORANDUM AND ORDER**

               - against -                      10 Civ. 5233 (NRB)

TRANSOCEAN LTD., STEVEN L. NEWMAN,
and ROBERT L. LONG,

                              Defendants.
----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     This securities class action against Transocean Ltd.
("Transocean") and its current and former Chief Executive
Officers ("CEOs") follows in the wake of the tragic accident on
the Deepwater Horizon on April 20, 2010. Lead Plaintiff Danica
Pension A/S ("Lead Plaintiff") brings the action on behalf of a
putative class of investors who purchased or otherwise acquired
shares in Transocean between August 5, 2009 and July 23, 2010
(the "Class Period").

     Presently before the Court is defendants' motion to dismiss
the Consolidated Class Action Complaint ("CAC") pursuant to
Federal Rule of Civil Procedure 12(b)(6). For the reasons stated
below, defendants' motion is granted.

## BACKGROUND

The following facts are drawn from the CAC and statements or documents attached to the CAC or incorporated into it by reference, which may be considered on a motion to dismiss. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). In particular, we rely on the report of the Chief Counsel to the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Chief Counsel's Report"), which is cited extensively throughout the CAC.[1]

## I.   The Defendants

Transocean is the "world's largest offshore drilling contractor." (CAC ¶ 3.) As of March 31, 2010, Transocean owned and operated 140 mobile offshore drilling units, primarily located in the Gulf of Mexico and the North Sea. (Id. ¶ 35.)

Defendant Robert L. Long ("Long") served as Transocean's CEO and was a member of its Board of Directors from October 2002 until February 28, 2010. (Id. ¶ 37.) Defendant Steven L. Newman ("Newman") replaced Long as the company's CEO on March 1, 2010, having previously served as Transocean's Chief Operating Officer ("COO") from May 2008 until November 2009 and again from

---

[1] The Chief Counsel's Report is provided as Exhibit 9 in Defendants' Appendix of Documents for the Motion to Dismiss. Other than the Chief Counsel's Report, we reference all exhibits attached in Defendants' Appendix as "D. Ex. _." Although the parties dispute – and in fact have separately briefed – whether the Court may take judicial notice of the contents of a number of these exhibits, we need not address this issue because we dismiss the CAC without relying on any of the disputed exhibits. (See Lead Pl.'s Response to Defs.' Request for Judicial Notice at 2 n.3 (listing the disputed exhibits).)

December 2009 to February 2010. (Id. ¶ 38.) Newman has also been Transocean's President since May 2008 and has been a member of its Board of Directors since May 14, 2010. (Id.)

## II.  __Transocean's Drilling Operations__

In addition to owning and leasing drilling rigs, Transocean provides equipment and personnel for its rigs' operations. (Id. ¶ 45.) Transocean provides trained personnel to "perform the important tasks [it] is responsible for as rig owner, including well control." (Id. ¶ 48.) "Although the rig lessee retains the right of inspection and approval of the work performed on its behalf, the actual performance and supervision of the work is normally Transocean's ultimate responsibility." (Id.)

Among the equipment that Transocean provides and maintains is a rig's blowout preventer ("BOP"). (Id. ¶ 46.) The BOP serves as both a drilling tool and a backstop device to control wellbore pressures.[2] (Chief Counsel's Report at 16.) The BOP is a "giant assembly of valves" that latches onto the well structure just above the seafloor. (Id.) Once the BOP and its accompanying apparatus are put into place, all subsequent drilling operations run through this system. (Id. at 17.)

The BOP is equipped with multiple means of controlling well pressure. Of particular importance, the BOP contains various

---

[2] The "wellbore" refers simply to the hole that is drilled and through which hydrocarbons are eventually extracted. (Chief Counsel's Report at 8.)

"rams" that can be activated to prevent hydrocarbons from flowing up the wellbore. (Id. at 21.) One of these rams – the blind shear ram – is the BOP's emergency line of defense against an oil spill. The blind shear ram consists of two metal blocks with blades on the inner edges. (Id. at 16.) It is designed to be able to cut through the drill pipe that runs through the wellbore, allowing the ram to entirely seal off the well and thus prevent any upward movement of hydrocarbons. (Id.)

## III.  **The Deepwater Horizon**

The Deepwater Horizon was a "dynamically-positioned, semi-submersible deepwater drilling vessel" owned by Transocean and leased to BP. (CAC ¶ 56.) It was first put into service in February 2001 and was later moved to the Macondo prospect site in the Gulf of Mexico. (Id.) The rig cost $350 million to build and had an insured value of $560 million. (Id. ¶ 49.) As of March 24, 2010, the Deepwater Horizon had drilled the deepest depth of any oil and gas well in the world, having drilled to a vertical depth of 35,050 feet at the Macondo site. (Id. ¶ 56.)

Transocean leased the Deepwater Horizon to BP for a daily operating rate of $533,495. (Id. ¶ 58.) Lead Plaintiff notes that under the terms of Transocean's contract with BP, Transocean was required to "maintain well control equipment and use all reasonable means to control and prevent fire and blowouts." (Id. ¶ 55.) Lead Plaintiff further notes that on the

day of the Macondo accident, 79 of the 126 employees on the Deepwater Horizon were Transocean employees, while only 7 of the 126 individuals were employees of BP. (Id. ¶ 54.)

## IV. **The Macondo Disaster**

The events leading up to the fateful explosions on the Deepwater Horizon have been extensively documented through a series of government investigations and reports. Thus, we only briefly recount those aspects of the timeline of events most relevant to the instant claims against defendants.

In April 2010, the crew on the Deepwater Horizon prepared for a process known as "temporary abandonment." Temporary abandonment refers to procedures that are used to secure a well so that a rig can safely be removed from the well site. (Chief Counsel's Report at 127.) BP planned to temporarily abandon the Macondo well and have the Deepwater Horizon replaced by another rig to complete the well construction process. (Id.)

On April 20, 2010, the crew conducted a series of tests as part of the temporary abandonment process. Two of the tests conducted were "negative pressure tests," during which the rig crew reduces the pressure inside the well and then monitors the well for any increase in pressure. (Id. at 146.) Any such increase signals a failed test because it indicates that hydrocarbons may be leaking into the well. (Id.) The Chief Counsel's Report concluded that both of the negative pressure

tests conducted on April 20, 2010 should have been treated as failed tests because the crew was unable to reduce pressure on the drill pipe and/or have the drill pipe pressure remain at the reduced levels once it was decreased.[3] (Id. at 153-60.) The rig crew conducting the tests, which consisted of both BP and Transocean employees, instead accepted an erroneous theory offered by Transocean's drilling supervisor to explain the anomalous results that they were viewing and did not recognize the likelihood that hydrocarbons were leaking into the well.[4] (Id. at 157-60.)

Following the completion of the pressure tests, the crew moved to the next step in the temporary abandonment procedure - displacing the mud and spacer fluid in the well with seawater. (Id. at 174.) The crew overseeing this process again included both Transocean and BP employees. (Id. at 174-75.) The crew began this process shortly after 8 p.m. (Id. at 175.) At 9:01

---

[3] During the first negative pressure test, conducted shortly before 5 p.m., the crew attempted several times to reduce the pressure on the drill pipe down to 0 psi, with the expectation that it would remain at that level, but each of these attempts proved unsuccessful. (Chief Counsel's Report at 153-57.) At roughly 6:40 p.m., the crew began a second negative pressure test. (Id. at 158.) However, at the behest of one of BP's on-site supervisors, the crew conducted the second test not on the drill pipe - as it had done before - but on a separate system known as the "kill line." (Id.) The crew was able to reduce the pressure on the kill line down to 0 psi and observe it remain at that level for 30 minutes, but over this entire period of time, the pressure on the drill pipe remained at 1,400 psi. (Id.) This fact should have again alerted the crew that hydrocarbons were leaking into the well, but the crew deemed the test to have been a success. (Id. at 159.)

[4] Specifically, Transocean's drilling supervisor speculated that the increases in pressure observed during the negative pressure tests were due to a so-called "bladder effect." (Chief Counsel's Report at 157.) The Chief Counsel's Report concluded that this theory was entirely unfounded. (Id.)

p.m., a "significant anomaly" occurred when pressure on the drill pipe suddenly began to increase.[5] (Id. at 177.) According to the Chief Counsel's Report, this "likely indicated that hydrocarbons were pushing heavier mud up from the bottom of the well against and around the drill pipe." (Id.) However, it was not until almost 9:30 p.m. that the crew recognized the existence of a problem. (Id. at 180.) By this point, the pressure levels inside the well had climbed to extremely anomalous levels. (Id. at 179-80.) Over the next ten minutes, the crew ran diagnostic tests and discussed the situation, but it did not activate the BOP to shut in the well. (Id. at 180-81, 198.)

At roughly 9:40 p.m., mud from the well shot to the top of the derrick and began to pour onto the main deck of the rig. (Id. at 181.) At 9:41 p.m., Transocean's drilling supervisor activated the BOP's annular preventer.[6] (Id.) However, the annular preventer failed to shut in the well, and tragically, at 9:49 p.m., the first explosion occurred. (Id. at 182.) Seven minutes after this initial explosion, a Transocean employee attempted to activate the blind shear ram by initiating the

---

[5] Up until this point, pressure on the drill pipe had steadily decreased, which was to be expected given that lighter seawater was replacing heavier mud and spacer fluid in the well. (Chief Counsel's Report at 177.)

[6] The annular preventer is a circular rubber element that is designed to expand such that it seals the well by filling the entire space between the drill pipe and the sides of the well. (Chief Counsel's Report at 16.)

rig's emergency disconnect system. (Id. at 197-98.) This attempt failed to trigger the blind shear ram, as did subsequent attempts using a mobile underwater robot in the weeks following the initial explosions. (Id. at 198, 208.) With the BOP unable to shut in the well, oil gushed unabated into the Gulf of Mexico over the next eighty-six days. (CAC ¶ 92.) In total, roughly 4.2 million barrels of oil poured into the Gulf of Mexico, rendering the accident the largest oil spill in history. (Id.)

## V.   <u>Alleged Misrepresentations and Omissions</u>

It is difficult to discern from Lead Plaintiff's sprawling CAC – and even its brief in opposition to the motion to dismiss – the specific misrepresentations or omissions that Lead Plaintiff intended to assert as being actionable under the securities laws. However, at oral argument, Lead Plaintiff identified the specific statements that it is pursuing as actionable misrepresentations, and we thus limit our analysis to these statements.[7] (Tr. of Oral Arg. at 4:23-5:23, 9:3-10, 17:5-14, 24:1-4, 29:6-15, 32:10-18, 39:17-40:6, 44:2-5.) The alleged misrepresentations are all comments made by Newman in the course of three investor conference calls held during the Class Period.

---

[7] Notably, at the outset of oral argument, Lead Plaintiff conceded that defendants' vague statements concerning Transocean's commitment to safety and training – cited repeatedly throughout the CAC – are not actionable statements under the securities laws. (Tr. of Oral Arg. at 4:23-5:23.) While we therefore need not engage in a formal analysis of these statements, we note that the statements would likely be considered expressions of "puffery" that cannot form the basis of a securities fraud claim. See <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004).

A. **August 5, 2009 Conference Call**

On August 5, 2009, Transocean held a conference call with analysts to discuss Transocean's results for the second quarter of 2009. One of the topics under discussion was Transocean's "rig utilization rate" for the quarter, meaning the number of revenue-earning days in the period as a percentage of the total number of calendar days in the period. (CAC ¶¶ 50, 64.) The following exchange occurred between an analyst and Newman with regard to this topic:

> [Analyst]: . . . I was wondering if you could comment a little bit, at least in this quarter, about the deepwater revenue efficiency? The utilization, I guess, for all three segments was below my expectations. I was wonder[ing] if you can comment if there is any quarter-specific items that led to the lower unexpected utilizations?

> [Newman]: . . . The deepwater segment of the fleet, which is the 4500 to 7500 foot segment, 16 rigs in that fleet was the largest underperformer in the second quarter. We had a couple of human error incidents on drill floors on a couple of those rigs and we had a handful of BOP problems. Nothing that I would characterize as systemic or quarter-specific. We did a deep dive on each one of those incidents. We have identified the root causes. We are going back to address them in our management system so they don't happen again. It is uncharacteristic in the second quarter. They were anomalies and I think I would just leave it at that.

> [Analyst]: Steven, any of those issues, could they impact Q3, these BOP issues that you're citing?

> [Newman]: No, no, no. They have all been resolved and BOP operations are a complex part of our business. It

> is something we pay a lot of attention to. All of the
> BOP incidents that occurred in the second quarter have
> been resolved and we will continue to keep our eye
> closely on the performance of our subsea equipment.

(D. Ex. 11 at 7-8.) Lead Plaintiff contends that the answers
provided by Newman in this exchange were materially misleading
because Transocean was "suffering 'systemic' failures and
problems with respect to personnel training, safety, and
preventative maintenance," despite Newman's assertions to the
contrary. (Id. ¶ 66.)

**B. February 24, 2010 Conference Call**

Lead Plaintiff next alleges that Newman made material
misrepresentations in the course of a conference call on
February 24, 2010. Specifically, Lead Plaintiff points to the
following exchange between Newman and an analyst:

> [Analyst]: In terms of where utilization came in below
> what you would have expected based on scheduled
> downtime, were there any issues remotely similar to
> those that occurred in the second quarter of 2009,
> where we had both technical problems related to BOPs
> as well as what was categorized as some human error
> problems?
>
> [Newman]: On the Ultra-Deepwater fleet . . . where we
> were particularly focused in the fourth quarter - and
> that differs from where we were in the second quarter
> of last year, which was on the conventional Deepwater
> fleet. In the Ultra-Deepwater fleet, we only had one
> BOP issue and one human error issue. We had a couple
> of startup issues and we had some equipment failures.
> But the issues in the fourth quarter were largely
> dissimilar from what we saw in the second quarter of
> last year.

> [Analyst]: So would it be fair to say then that both the nature and the number of those issues in Q4 was more in line with what you would consider normal, whereas second-quarter 2009 was clearly abnormal?
>
> [Newman]: Yes, I wouldn't characterize the fourth quarter of 2009 – I wouldn't characterize the performance on the Ultra-Deepwater fleet as normal, because it was below the historical revenue efficiency for that class. So I don't want to lead you to conclude that that is something we ought to expect going forward. But we have identified the issue, the equipment failure issues. We have addressed the BOP control issue. And the human error issue is something we continue to focus on through our training and competency programs.

(D. Ex. 12 at 16.) Lead Plaintiff alleges that these statements were materially misleading for substantially the same reasons as the statements on the August 2009 conference call – namely that "Transocean was suffering from company-wide failures in safety and preventative maintenance" at the time the statements were made. (Id. ¶ 81.)

## C. **May 28, 2010 Conference Call**

The final misrepresentations alleged by Lead Plaintiff occurred during a May 28, 2010 conference call held by Transocean to update investors on the Macondo accident. Lead Plaintiff contends that the following statement made by Newman during his opening comments was an actionable misrepresentation:

> There have been a number of questions raised about the BOP, and so I will try to address them today. The Deepwater Horizon's BOP was tested, just as other BOPs are tested, every week for function and every other

11

week for pressure containment capability. The pressure
containment capability of the BOP was tested and it
passed those tests on April 10. The function of the
BOP was tested on April 17, and the BOP passed those
tests as well.

(D. Ex. 14 at 3.) Lead Plaintiff contends that this statement
was misleading because the tests referred to by Newman were
conducted at pressure levels that were lower than that which is
usually required for such tests and lower than the pressure
levels at which the BOP would be expected to operate in the
event of a blowout. (Id. ¶ 115.)

Finally, Lead Plaintiff challenges Newman's response in the
following question and answer exchange:

[Analyst]: On the Horizon I just wanted to ask, was
all safety equipment, pressure gauges, etc. that was
supposed to be hooked up and functional actually
hooked up and functional at the time of the incident,
to the best of your knowledge?

[Newman]: As far as we know, yes.

(D. Ex. 14 at 6.) Lead Plaintiff suggests that this answer was a
material misrepresentation given the existence of a September
2009 audit of the Deepwater Horizon by BP that had identified
390 preventative maintenance tasks that Transocean had neglected
to perform. (Id. ¶ 120.) Lead Plaintiff further suggests that
Newman's answer was misleading given his presumed knowledge of
the general substandard safety practices maintained by
Transocean on the Deepwater Horizon. (Id.)

## PLEADING STANDARDS

### I.  Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted). Ultimately, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570. If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. This pleading standard applies in "all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1953 (2009) (internal quotation marks omitted).

### II. Securities Exchange Act Claims

Claims of securities fraud brought under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act") are "subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." ATSI

Commc'ns, 493 F.3d at 99. The heightened pleading requirements
are set forth in Rule 9(b) of the Federal Rules of Civil
Procedure and the Private Securities Litigation Reform Act (the
"PSLRA"), 15 U.S.C. § 78u-4(b). ECA & Local 134 IBEW Joint
Pension Trust of Chi. v. JP Morgan Chase Co. ("ECA"), 553 F.3d
187, 196 (2d Cir. 2009).

### a. **Rule 9(b)**

While the rules of pleading in federal court usually
require only "a short and plain statement" of the plaintiff's
claim for relief, Fed. R. Civ. P. 8(a), averments of fraud must
be "state[d] with particularity." Fed. R. Civ. P. 9(b);[8] see also
ATSI Commc'ns, 493 F.3d at 99. In order to satisfy Rule 9(b), a
plaintiff must "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state
where and when the statements were made, and (4) explain why the
statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170
(2d Cir. 2004) (internal quotation marks omitted). Furthermore,
"[a]llegations that are conclusory or unsupported by factual
assertions are insufficient." ATSI Commc'ns, 493 F.3d at 99.

### b. **PSLRA**

In the context of securities fraud allegations, the PSLRA
has expanded on Rule 9(b)'s pleading requirements. See 15 U.S.C.

---

[8] Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or
mistake, a party must state with particularity the circumstances constituting
fraud or mistake. Malice, intent, knowledge, and other conditions of a
person's mind may be alleged generally."

§ 78u-4(b). "The statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)). "Therefore, 'while we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." <u>ECA</u>, 553 F.3d at 196 (internal alteration omitted) (quoting <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u> ("<u>Teamsters</u>"), 531 F.3d 190, 194 (2d Cir. 2008)).

## DISCUSSION

Lead Plaintiff asserts claims against Transocean and Newman under Section 10(b) of the Exchange Act and SEC Rule 10b-5 and claims against Newman and Long under Section 20(a) of the Exchange Act.[9]

---

[9] Lead Plaintiff originally asserted Section 10(b) and Rule 10(b)-5 claims against all three defendants, but at oral argument, Lead Plaintiff indicated that it is now only pursuing claims against Long under Section 20(a). (Tr. of Oral Arg. at 43:19-44:5.)

## I.   Elements of Section 10(b) and Rule 10b-5 Claims

"Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206 (1976)). The SEC implemented Section 10(b) of the Exchange Act by promulgating Rule 10b-5, 17 C.F.R. § 240.10b-5. In relevant part, Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

In order to sustain a private cause of action for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 337 (2d Cir. 2011) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)). Defendants contend that Lead Plaintiff has failed to sufficiently plead three of these

elements: a material misrepresentation or omission, scienter, and loss causation. As discussed in detail _infra_, we hold that Lead Plaintiff has failed to sufficiently allege a material misrepresentation or omission, and, even if it were able to do so, Lead Plaintiff has failed to plead facts supporting a strong inference of scienter.[10]

### A. **Material Misrepresentation or Omission**

In evaluating an alleged misrepresentation or omission, a statement is measured not by its literal truth, but rather by its ability "to accurately inform rather than mislead prospective buyers." _McMahan & Co. v. Wherehouse Entm't, Inc._, 900 F.2d 576, 579 (2d Cir. 1990). However, a plaintiff's allegations must amount to more than "fraud by hindsight." _Novak v. Kasaks_, 216 F.3d 300, 309 (2d Cir. 2000). "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." _Id._ Moreover, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." _Id._

With regard to the materiality requirement, "[a] fact is material if there is a substantial likelihood that a reasonable

---

[10] We therefore need not address the parties' arguments concerning loss causation.

shareholder would consider it important in deciding how to act." Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011) (internal quotation marks and alteration omitted). Omissions are considered material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. (internal quotation marks omitted). The Supreme Court has recently cautioned, however, that "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011) (internal quotation marks and alteration omitted). Thus, "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose . . . by controlling what they say to the market." Id. at 1322.

**B. Scienter**

Under the PSLRA, it is necessary to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite state of mind in a Section 10(b) and

Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" <u>ECA</u>, 553 F.3d at 198 (quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319 (2007)).

Second Circuit case law provides that a strong inference of fraud may be established by alleging facts demonstrating (a) "that defendants had the motive and opportunity to commit fraud," or (b) "strong circumstantial evidence of conscious misbehavior or recklessness."[11] <u>Id</u>. However, in assessing whether a plaintiff has met its burden of pleading a strong inference of scienter, the Court must "take into account plausible opposing inferences," and "[the] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs</u>, 551 U.S. at 323-24.

To raise a strong inference of scienter through the motive and opportunity prong, a plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud." <u>ECA</u>, 553 F.3d at 198 (internal quotation marks omitted). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer

---

[11] Although this standard predates the passage of the PSLRA, the Second Circuit has explicitly noted that "both options for demonstrating scienter, either with motive and opportunity allegations or with allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness, survive the PSLRA." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 139 (2d Cir. 2001).

compensation, do not constitute 'motive' for purposes of this inquiry." Id.

Even when motive is lacking, a plaintiff may establish a strong inference of scienter by alleging facts that show "strong circumstantial evidence of conscious misbehavior or recklessness."[12] Id. Recklessness in this context has been defined as conduct that is "highly unreasonable and [] represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks and alteration omitted). The Second Circuit has also clarified that recklessness in this context refers to "conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." Id. (internal quotation marks and alteration omitted).

A plaintiff can make a showing of conscious misbehavior or recklessness through evidence demonstrating that the defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that

---

[12] However, when a plaintiff fails to allege adequate motive, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater. See ECA, 553 F.3d at 198-99 (citing Kalnit, 264 F.3d at 142).

their public statements were not accurate; or (4) failed to check information they had a duty to monitor." ECA, 553 F.3d at 199 (internal quotation marks omitted).

## II.  Analysis

We apply these legal standards to the specific conference call statements at issue to determine whether Lead Plaintiff has pleaded actionable misrepresentations or omissions.

### A.  August 5, 2009 Conference Call

Lead Plaintiff challenges Newman's characterization of the "couple of human error incidents" and "handful of BOP problems" that occurred in the second quarter of 2009 as anomalies rather than systemic. Lead Plaintiff further takes issue with Newman's statement that Transocean was "going back to address [these problems] in [its] management system so they don't happen again." For ease of organization, we separately address Newman's comments concerning human error issues on the one hand and BOP problems on the other.

#### 1. Human Error Problems[13]

##### i.  Material Misrepresentation or Omission

Lead Plaintiff has not alleged any facts concerning the specific human error problems that occurred in the second

---

[13] Lead Plaintiff interprets Newman's references to human error problems as encompassing essentially all issues relating to the operation and maintenance of Transocean's rigs. While in our view the reference to human error problems has a much more circumscribed meaning, we treat the phrase in the light most favorable to Lead Plaintiff for purposes of the motion to dismiss and thus adopt Lead Plaintiff's interpretation.

quarter of 2009. Thus, Lead Plaintiff has provided no evidence to demonstrate that the human problems referenced by Newman were in fact systemic throughout the company, and there is no basis on which to conclude that Newman's August 2009 statements concerning human error problems were false on their face.

Nevertheless, Lead Plaintiff contends that these statements were misleading given the supposed widespread deficiencies in "the company's safety culture" during this period. (Tr. of Oral Arg. at 11:2-5; see also id. at 15:18-22.) It is not readily apparent, however, from Lead Plaintiff's vague reference to Transocean's "safety culture" precisely what omitted information Lead Plaintiff believes Newman should have divulged to render his statements not misleading. If Lead Plaintiff is suggesting that Newman should have disclosed that Transocean had experienced, and would continue to experience, safety-related problems, it is clear that Transocean did disclose such concerns to the market at various points in time.

For instance, in its 2009 Proxy Statement, filed April 9, 2009, Transocean noted that it was foregoing safety-related bonuses to executives because the company had experienced two offshore fatalities in 2008. (D. Ex. 5 at 45.) Subsequently, in the Fall 2009 issue of its corporate magazine Beacon, Transocean announced that it had commissioned Lloyd's Register ("Lloyd's") to conduct "a major global evaluation of our safety processes

and culture to help us understand where our practices are effective and where we need to improve."[14] (D. Ex. 17 at 7.)

The announcement of the Lloyd's audit is relevant for several reasons. First, as discussed _infra_, the announcement of a third-party audit of the company's safety practices undercuts any notion that there was "an intent to deceive" the market as to whether Transocean needed to improve its safety practices. Second, the announcement renders Newman's conference call statement that Transocean was "going back to address [the second quarter problems] in [its] management system" essentially true on its face. That is, the commissioning of the audit in October 2009 – which would involve an 18-day review of "the company Safety Management System, safety culture, and safety climate" (D. Ex. 59 at 6) - reveals the Transocean did actually go back to address safety problems through its management system shortly after the August 2009 conference call. Finally, the announcement of the Lloyd's audit, in addition to the announcement that Transocean was foregoing safety-related bonuses for the 2008 year, demonstrates that any general statement Newman could have made on the August 2009 call indicating that Transocean faced significant safety challenges would not have "significantly

---

[14] The announcement also conveyed that the audit would involve visits by Lloyd's "to 24 rigs, in addition to many offices, to review our systems, policies and procedures, our training programs, day-to-day safety practices and much more." (D. Ex. 17 at 7.)

altered the 'total mix' of information made available."[15] Hutchison, 647 F.3d at 485 (internal quotation marks omitted).

To the extent that Lead Plaintiff suggests that Newman was under an obligation to divulge specific safety-related information on the conference call, such as audits that had been conducted of rigs or individual safety practices that were in need of improvement, such a proposition would run counter to established precedent refusing to impose a disclosure burden of this type on public corporations, especially large-scale ones such as Transocean. See, e.g., Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52-53 (2d Cir. 1995) (noting that the defendant was "a world-wide company engaged in heavily regulated businesses" and finding that "[i]t would be unduly burdensome and impractical to publicly disseminate the results of every inspection of every plant"). The notion that a company need not disclose a laundry list of internal information holds particular force in the context of a question-and-answer session with analysts,

---

[15] Lead Plaintiff points to the fact that since 2008, nearly 75% of the incidents triggering investigations by the Minerals Management Service ("MMS") occurred on Transocean rigs, and Lead Plaintiff contends that this statistic evidences the misleading nature of Newman's statement concerning the systemic versus anomalous nature of the prior quarter's incidents. (Tr. of Oral Arg. at 10:24-11:2; CAC ¶ 103.) Again, Lead Plaintiff fails to connect the specific quarter's incidents to any other problems Transocean may have experienced. Moreover, the Wall Street Journal article reporting this statistic noted that the MMS investigations in question were publicly available. (D. Ex. 36 at 3.) Not only does this fact undercut any claim that Transocean's failure to report the statistic constitutes a material omission, but the public nature of the MMS investigations reinforces the notion that the investing public was well-aware of the safety issues associated with Transocean's operations.

particularly when, as here, the analysts' inquiries are surface-level in nature. To hold otherwise, and to allow Lead Plaintiff's claims to proceed because certain undisclosed safety issues may have contributed to the Deepwater Horizon disaster, would be to permit a claim based on "fraud by hindsight." See Novak, 216 F.3d at 309; see also In re Union Carbide Class Action Sec. Litig., 648 F. Supp. 1322, 1327-28 (S.D.N.Y. 1986) (dismissing the complaint when it "sound[ed] more in possible corporate mismanagement . . . than in fraud.").

### ii. Scienter

Even assuming, arguendo, that it was materially misleading for Newman to characterize the prior quarter's human error incidents as non-systemic, Lead Plaintiff has failed to plead facts establishing the requisite strong inference of scienter.

Lead Plaintiff contends that Newman recklessly disregarded facts that contradicted his statements on the August 2009 conference call. (Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Consolidated Class Action Compl. ("Pl.'s Mem.") at 22-30.) In support of this position, Lead Plaintiff cites various internal databases to which Newman allegedly had access as well as specific facts negatively reflecting on Transocean's safety record of which Newman was or should have been aware.[16] (Id.)

---

[16] While Lead Plaintiff briefly contends in its opposition brief that scienter can be established under the motive and opportunity prong as well, Lead Plaintiff suggested at oral argument that its theory of scienter is

"Scienter cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (internal quotation marks and alteration omitted). In addition, where a plaintiff's theory of scienter rests on the existence of adverse facts to which a defendant supposedly had access, the plaintiff "must specifically identify the reports or statements containing this information." Teamsters, 531 F.3d at 196 (internal quotation marks omitted). Simply put, a plaintiff must establish "what the [d]efendants knew and when they knew it." Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 176 (S.D.N.Y. 2010).

In our view, Lead Plaintiff's allegations amount to a claim that Newman must have been aware of safety problems that existed throughout the company given his high-level corporate position. For instance, Lead Plaintiff suggests that "[t]he only

---

principally one of recklessness. (Tr. of Oral Arg. at 41:14-42:12.) Nevertheless, we note that any theory of motive and opportunity in this case is unconvincing. A desire to inflate the company's stock price is too generalized a motive to satisfy this inquiry. See ECA, 553 F.3d at 198. We are also not persuaded by the suggestion that Newman was motivated to commit fraud in order to "keep rigs running at the expense of necessary and routine maintenance to maximize the all-important rig utilization rate." (Pl.'s Mem. at 31.) There is no meaningful link between Newman's statements on the conference call and company policy pertaining to rig utilization. It is far from clear that even if Newman had refrained from the allegedly misleading comments, this would have resulted in a program of greater maintenance and thus a lower utilization rate.

reasonable inference that arises from Defendants'
responsibilities and bonus compensation relating to safety and
maintenance issues is that Defendants were responsible for
monitoring the Company's safety and maintenance systems and
protocols and knew or recklessly disregarded Transocean's
systemic and unremedied failures in these areas during the Class
Period." (Pl.'s Mem. at 25.) Scienter simply cannot be
established upon such a basis. See In re Refco, Inc. Sec.
Litig., 503 F. Supp. 2d at 649.

While Lead Plaintiff lists several internal databases that
supposedly contained information contrary to Newman's public
assertions, Lead Plaintiff does not identify any pre-August 2009
report in these databases that undermines Newman's comments on
the August conference call,[17] nor does Lead Plaintiff plead facts
establishing that Newman was aware of each and every report that
was eventually entered into the databases. Cf. Johnson v.
Siemens AG, No. 09 Civ. 5310 (JG)(RER), 2011 WL 1304267, at *16

---

[17] Lead Plaintiff does cite the September 2009 BP audit of the Deepwater
Horizon as a report that was entered into the internal databases and
allegedly contradicted Newman's public statements. (Pl.'s Mem. at 25.) Even
if this report were relevant to the August 2009 conference call (and it is
relevant to the February 2010 conference call), it is not plausible to allege
that Transocean's President and COO was knowledgeable of the contents of
every audit of every one of Transocean's 140 rigs. Cf. Johnson v. Siemens AG,
No. 09 Civ. 5310 (JG)(RER), 2011 WL 1304267, at *16 (E.D.N.Y. Mar. 31, 2011)
(noting the massive scale of the defendant's operations and concluding that
"[i]t is hardly plausible that the company's management reviewed daily status
reports prepared by field engineers to track the implementation of individual
contracts."). It is also not clear that an audit of a single rig is relevant
to Newman's conference call comments about whether discrete problems that
occurred in the prior quarter were systemic throughout the company.

(E.D.N.Y. Mar. 31, 2011) (rejecting lead plaintiff's assertion of recklessness when "lead plaintiff [did] not specifically allege that [the company's] senior management ever received any of the reports identified in the amended complaint"); Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 522-23 (S.D.N.Y. 2005) (rejecting plaintiff's theory of recklessness that was premised on the existence of internal channels of communication).

The specific adverse facts that Lead Plaintiff does articulate as information that Newman allegedly knew or recklessly disregarded – and which is put forward as evidence of Transocean's deficient safety culture – are almost entirely derived from sources released long after the challenged conference call statements. For instance, Lead Plaintiff repeatedly invokes aspects of the Lloyd's audit, which was released to Transocean in May 2010, such as an anonymous quote from a Transocean employee that the company's philosophy could be described as "[r]un it, break it, fix it" and a finding that many workers feared reprisals if they reported mistakes or other problems.[18] (CAC ¶ 137.) Lead Plaintiff also relies extensively on congressional testimony of Transocean officials in the months after the Macondo accident, including the July 23, 2010 testimony of Michael K. Williams, Transocean's Chief Electrical

---

[18] We note that the portions of the Lloyd's audit excerpted by Lead Plaintiff grossly mischaracterize the overall tenor of the report, which relayed many positive findings concerning Transocean's safety culture. (D. Ex. 59.)

Technician on the Deepwater Horizon. Williams' testimony included the disclosure that Transocean ran its entire fleet with critical safety systems in "bypass mode" and Williams' assessment that pieces of equipment on the Deepwater Horizon were so poorly maintained that they could be described as "junk."[19] (Id. ¶ 139.)

For obvious reasons, a showing of recklessness cannot be premised on information that was not reasonably available to the speaker at the time of the alleged misrepresentations. Hence, the above-described reports and testimony do not support a finding of recklessness vis-à-vis the August 2009 (or February 2010) conference call. With respect to the Lloyd's audit in particular, it would be perverse to base a finding of recklessness on information that not only was unavailable at the time of the alleged misrepresentations, but would have never become available if Transocean had not commissioned the audit in the first place as a means of addressing perceived safety issues.

The commissioning and contemporaneous announcement of the Lloyd's audit also undermines any inference that Newman acted with an intent to deceive, manipulate, or defraud, and it certainly renders it difficult to conclude that the inference of

---

[19] Other reports that Lead Plaintiff contends are probative of Newman's scienter include the Chief Counsel's Report, which was released in 2011, and a BP investigation that took place after the Macondo accident. (CAC ¶¶ 180, 185.)

scienter is at least as compelling as any opposing inference one could draw. Cf. Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010) (holding that the defendant's ordering of an internal investigation upon learning of the relevant problems weakened the inference of scienter). The more compelling inference is that Newman provided direct, albeit brief, responses to quarter-specific questions, while separately the company would set out to learn of any problems in its general safety practices through the Lloyd's audit. See id. ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal." (quoting Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 761 (7th Cir. 2007)).

### 2. BOP Problems

#### i. Material Misrepresentation or Omission

Like the human error comments, the main thrust of Newman's BOP-related comments on the August 2009 conference call related to the specific BOP problems that had occurred in the prior quarter. After stating that there had been "a handful of BOP problems" in the quarter, Newman added that those problems were "[n]othing that I would characterize as systemic or quarter-specific. We did a deep dive on each one of those incidents. We have identified the root causes." In the analyst's follow-up

question, the analyst asked whether "any of <u>those issues</u>, could they impact Q3, <u>these BOP issues</u> that you're citing?" Newman responded: "No, no, no. <u>They have all been resolved</u> and BOP operations are a complex part of our business. It is something we pay a lot of attention to. <u>All of the BOP incidents that occurred in the second quarter have been resolved</u> and we will continue to keep our eye closely on the performance of our subsea equipment."

Again, Lead Plaintiff does not identify the nature of the BOP problems that occurred in the second quarter of 2009, nor does Lead Plaintiff point to any evidence to suggest that the type of BOP problems that manifested in that quarter were indeed systemic throughout the company. Lead Plaintiff therefore does not adequately plead that Newman's comments as they related to the prior quarter's BOP incidents were affirmative misrepresentations.

When confronted with this reality at oral argument, Lead Plaintiff shifted its focus to the more generalized portions of Newman's answers, namely that "BOP operations are a complex part of our business," "[i]t is something we pay a lot of attention to," and "we will continue to keep our eye closely on the performance of our subsea equipment." (Tr. of Oral Arg. at 18:4-20.)

Yet these comments appear to all be true on their face. Lead Plaintiff would certainly not doubt that BOP operations are a complex part of Transocean's business, and this statement even implicitly concedes that BOP problems will likely continue to occur in the future. There is also ample evidence in the record that Transocean did "pay a lot of attention to" its BOP operations and that it would "continue to keep [its] eye closely on the performance of [its] subsea equipment." For instance, the Chief Counsel's Report revealed that, pursuant to federal regulations, a multitude of tests were regularly performed on the Deepwater Horizon's BOP, including some inspections that were done on a nearly daily basis. (Chief Counsel's Report at 205-06.)

To be clear, our holding should not be understood as making any observation relevant to the pending negligence claims against Transocean. We offer no comment on the adequacy of Transocean's BOP protocols. Rather, our holding is limited to a finding that Newman's statements were not material misrepresentations of Transocean's ongoing practices and therefore do not amount to violations of the securities laws.

### ii. <u>Scienter</u>

Once again, even assuming that Newman's BOP-related comments were materially misleading – in that BOP problems of the type that occurred in the prior quarter were actually

systemic - Lead Plaintiff has not pleaded facts to suggest that Newman acted with scienter in making these comments.

The facts that Lead Plaintiff cites as evidence of systemic BOP problems and which Lead Plaintiff alleges Newman knew or recklessly disregarded are taken from: (i) a BP investigation of the Deepwater Horizon after the Macondo accident and (ii) the Chief Counsel's Report's findings regarding BOP maintenance on the Deepwater Horizon. (Pl.'s Mem. at 29; CAC ¶¶ 178-86.) Thus, the evidence on which Lead Plaintiff relies is derived from investigations that were limited to one rig and that occurred well after the challenged conference call statements. There is no indication that, contemporaneous to the conference call statements, the information discovered through these investigations was produced in a format readily accessible to a high-level executive such as Newman and was presented in a manner that would have alerted such an executive of the existence of systemic problems. See Teamsters, 531 F.3d at 196. In short, a finding of scienter based on the post-hoc assessments cited by Lead Plaintiff would impute fraudulent intent to Newman based on information that he likely did not receive and the relevance of which is now being ascribed largely through a hindsight view.

## B. **February 24, 2010 Conference Call**

The alleged misrepresentations on the February 24, 2010 call are highly similar in nature to those from the August 2009 call. After receiving a question from an analyst concerning the rig-utilization rate in the fourth quarter of 2009, Newman stated that Transocean had experienced "one BOP issue," "one human error issue," "a couple of startup issues," and "some equipment failures" in that quarter. When the analyst then asked whether "the nature and the number of those issues in Q4" should be considered normal, Newman responded: ". . . I don't want to lead you to conclude that that is something we ought to expect going forward. But we have identified the issue, the equipment failure issues. We have addressed the BOP control issue. And the human error issue is something we continue to focus on through our training and competency programs." Lead Plaintiff contends that the final three statements in this answer constitute actionable misrepresentations. (Tr. of Oral Arg. at 24:1-4.) Specifically, Lead Plaintiff suggests that it was materially misleading for Newman to claim that Transocean had "identified," "addressed," and would "continue to focus on" the respective issues from the prior quarter given the allegedly systemic nature of these problems throughout Transocean's operations.

### 1. <u>Human Error and Equipment Problems</u>

Newman's challenged statements concerning the human error issue and the equipment failures from the fourth quarter of 2009 are not actionable for substantially the same reasons as the previously discussed statements concerning human error issues on the August 2009 conference call. First, Lead Plaintiff has provided no particularized facts to suggest that Transocean had not actually "identified" the equipment issues from the prior quarter, nor has Lead Plaintiff provided any evidence demonstrating that these issues were systemic to Transocean's rigs. Second, Lead Plaintiff has not identified any material omitted information, either general to Transocean's safety culture or specific to individual safety and maintenance issues, that Transocean had a duty to disclose so as to render the affirmative statements not misleading. Finally, even if Lead Plaintiff were able to adequately allege a material misrepresentation or omission, Lead Plaintiff has not identified facts that were reasonably available to Newman at the time of the February 2010 conference call that would implicate a strong inference of scienter.

We note, moreover, that Transocean made several additional disclosures in the period surrounding the February 2010 conference call that further weaken Lead Plaintiff's position.

In an interview in the Winter 2010 edition of Beacon,[20] Newman was asked, "What does Transocean need to be doing better?" (D. Ex. 18 at 12.) Newman responded:

> Execution, really on a couple of fronts, and consistency. First of all, we have to improve our safety performance. You know, within 92 days last year, between June 15th and September 15th, we suffered four work-related fatalities on four of our installations. We absolutely have to improve the effectiveness of our safety management system. Whether that means modifying the system itself, or simply doing a better job of implementation, we have to improve. We cannot be a company where we suffer fatalities.
>
> The second one is really around performance in terms of the reliability and the performance of our equipment. Our downtime is above our targets. Our lost revenue is above our targets. These targets are certainly achievable. We have to figure out what it is that's preventing us from achieving these targets on a consistent basis, and fix it.

(Id. at 12-14.)

In a subsequent letter to shareholders on March 24, 2010, Newman and Transocean's Chairman Robert E. Rose again reminded investors of the four fatalities that had occurred on Transocean rigs in 2009 and added that Transocean had "embarked on a thorough review of our safety systems across our fleet."[21] (D. Ex. 3 at 3.) In its 2010 Proxy Statement, filed April 1, 2010, Transocean revealed that it had failed to meet targets on two of

---

[20] The precise release date of this edition is not apparent, but references in the issue to then-upcoming events in mid-February 2010 indicate that the issue was likely released prior to the February 24, 2010 conference call.

[21] Presumably Newman and Rose were referring to the Lloyd's audit that Transocean had commissioned.

its three safety metrics for 2009. (D. Ex. 6 at P-35 to P-36.) Transocean also revealed in the Proxy Statement that because of the four fatalities that had occurred during the prior year, the company was foregoing safety-based bonuses to executives for 2009. (Id. at P-38.)

These disclosures thoroughly undercut Lead Plaintiff's contention that Newman's statements on the February 2010 conference call – particularly the statement that Transocean would "continue to focus on" the human error issue – somehow created a false and misleading perception that Transocean did not face company-wide challenges related to safety. Stated differently, any qualification by Newman to his answers on the conference call that reminded investors of these safety challenges would not have significantly altered the mix of information available to investors and therefore would not have been material. The disclosures surrounding the conference call, most notably the Beacon magazine interview, also strongly negate any inference that Newman intended to deceive the market as to safety shortcomings in the company's operations.

### 2. BOP Problems

Newman's statement on the February 2010 conference call that Transocean had "addressed the BOP control issue" is not actionable for the same reasons as the analogous BOP-related statements on the August 2009 conference call.

For one, Lead Plaintiff does not plead facts sufficient to establish that the statement constituted an affirmative misrepresentation. The statement came in the context of Newman's prior answer on the call, in which Newman conveyed that Transocean had experienced one BOP issue in the fourth quarter of 2009. In response to this information, the analyst asked whether "those issues in Q4" should be considered normal. Newman's subsequent response that the company had "addressed the BOP control issue" was thus clearly in relation to the specific BOP issue that had occurred in the prior quarter. As with the August 2009 conference call, Lead Plaintiff does not provide any facts concerning the nature of the BOP issue that had materialized in the prior quarter, and therefore, Lead Plaintiff provides no basis on which to infer that Transocean had not addressed this issue as Newman suggested.

Even if Lead Plaintiff did sufficiently plead that this comment was a material misrepresentation, Lead Plaintiff again fails to plead facts establishing a strong inference of scienter. To demonstrate recklessness with respect to this statement, Lead Plaintiff points to the same post-Macondo accident investigations – the BP investigation and the Chief Counsel's Report - that it cited in attempting to establish scienter for the August 2009 BOP-related statements. Thus, Lead Plaintiff has failed to identify contemporaneous reports or

other sources of information that contradicted Newman's statement, let alone identify any such reports for which it would be reasonable to assume that they were presented to Newman. Cf. Freudenberg, 712 F. Supp. 2d at 198 (finding scienter adequately alleged when the complaint contained allegations from confidential witnesses describing "what they told Defendants, what Defendants knew, and/or what was discussed internally that is alleged to be contrary to Class Period statements").

## C. **May 28, 2010 Conference Call**

The final set of alleged misrepresentations, stemming from Transocean's May 28, 2010 analyst conference call, are distinct from the previous alleged misrepresentations in that they occurred after the Macondo accident and are specific to the Deepwater Horizon. Like the previous statements in question, however, Lead Plaintiff has failed to adequately plead that these statements constitute actionable misrepresentations.

### 1. **Successful BOP Tests**

The first comments from the May 2010 conference call that Lead Plaintiff contends are actionable involve statements by Newman concerning pressure tests that had been performed on the Deepwater Horizon's BOP prior to the accident. Specifically, Newman stated: "The Deepwater Horizon's BOP was tested, just as other BOPs are tested, every week for function and every other

week   for   pressure   containment   capability.   The   pressure containment capability of the BOP was tested and it passed those tests on April 10. The function of the BOP was tested on April 17, and the BOP passed those tests as well."

Lead Plaintiff does not suggest that these statements were false on their face. Rather, Lead Plaintiff maintains that the comments were materially misleading given that the pressure tests on the BOP in the months preceding the accident were performed at levels well below those normally required under MMS regulations. (Pl.'s Mem. at 13; Tr. of Oral. Arg. at 29:11-21.)

Lead Plaintiff neglects the rather important fact that MMS had approved all of the testing that was done on the Deepwater Horizon's BOP at reduced pressure levels. (Chief Counsel's Report at 206.) The Chief Counsel's Report even noted that the "lowered pressure testing regime . . . was consistent with industry practice." (Id.) We are unable to accept that the securities laws imposed a duty on Newman to qualify his comments by stating that even though all pressure tests were successful, and even though the relevant government agency approved the tests at those levels, the tests may not have been reliable because the government agency may have been irresponsible in authorizing the reduced requirements as it did. Put somewhat differently, the securities laws cannot be read to require

companies to publicly second-guess government regulators in such a manner.

## 2. Statement that Equipment and Pressure Gauges Were Functional "As Far As We Know"

The final alleged misrepresentation came in connection with an analyst's question over the functionality of equipment on the Deepwater Horizon at the time of the April 20, 2010 accident. The analyst asked Newman, "Was all safety equipment, pressure gauges, etc. . . . hooked up and functional at the time of the incident, to the best of your knowledge?" Newman responded, "As far as we know, yes."

As evidence that Newman materially misled investors when he provided this answer, Lead Plaintiff cites BP's September 2009 audit of the Deepwater Horizon, which identified 390 preventative maintenance tasks that were overdue, and the previously referenced July 23, 2010 congressional testimony of the Deepwater Horizon's Chief Electrical Technician. (Pl.'s Mem. at 13; Tr. of Oral Arg. at 32:10-38:1.) Lead Plaintiff focuses particularly on the revelations in the technician's testimony, arguing that Newman had no basis on which to tell investors that all equipment was functional at the time of the accident given that some of the equipment was tested and run with alarms in bypass mode. (Tr. of Oral Arg. at 32:10-38:1.)

Lead Plaintiff again omits key information from the context of Newman's statement. It is true that the September 2009 BP audit identified 390 preventative maintenance tasks that were overdue, but just five days later, BP determined that the rig was operational and authorized work on the rig to resume. (Chief Counsel's Report at 223.) By March 30, 2010, a significant number of the tasks identified in the audit had been addressed and BP described Transocean's progress as "commendable." (Id.) Lead Plaintiff also neglects the fact that on April 1, 2010, less than three weeks before the accident, an MMS inspection of the Deepwater Horizon "found no incidents of noncompliance and did not identify any problems justifying stopping work." (Id.)

These facts must be considered in conjunction with the precise question and answer under dispute. Newman was asked whether all equipment and pressure gauges were hooked up and functional "to the best of [his] knowledge," to which he responded that they were, "As far as we know." Newman was thus not asked for, and in response did not supply, a guarantee that all equipment was functioning properly at the time of the accident. Rather, he was asked to comment on whether – at the time of the conference call – the company was aware of any equipment that was not hooked up and functional when the accident occurred. Given the certifications that the rig was in safe working condition, by BP following the September 2009 audit

and by MMS just several weeks before the accident, Lead Plaintiff has not provided a plausible reason to believe that Newman was actually aware of any equipment that was not functional at the time of the accident, at least when he made this statement (notably several months before the technician's congressional testimony). In fact, the Chief Counsel's Report confirms that "[a]t the time of the blowout, both BP and Transocean believed the Deepwater Horizon was in safe operating condition." (Id.)

Newman's answer must also be considered in the context of the other portions of the conference call in which Newman repeatedly admitted that Transocean did not yet know the causes of the accident. In his opening statement, Newman noted that "it is premature to reach definitive conclusions about what caused the April 20 explosion" and added that "[i]t is clear that the BOP was unable to shut off the well . . . . [W]e can say with certainty that a BOP is designed to function under certain conditions, and it appears one or more of those conditions . . . were not met on April 20." (D. Ex. 14 at 3-4.) Near the end of the call, Newman was asked about possible red flags that became apparent to the rig crew in the hours preceding the initial explosion. Newman responded that Transocean could not knowledgeably answer that question until it undertook an investigation of "the sequence of events that took place on

April 20; the level of information that was passed around; who had access to it; who knew what; the decisions that were made on April 20; and who made those decisions." (Id. at 26.) Thus, the clear message conveyed to investors was that Transocean could not provide assurances as to the precise circumstances surrounding the accident, including as to why the BOP had failed to properly function. Lead Plaintiff cannot plausibly allege that Newman's "As far as we know, yes" answer was intended to mislead investors to believe that equipment failures were definitively not a contributing cause of the accident.

We have no illusions about the purpose of the May 28, 2010 conference call from Transocean's perspective. Clearly, Transocean was engaging in a form of damage control in the midst of the fallout from the continuing oil spill. Yet regardless of the potential interest of analysts as to any problems ever identified on the Deepwater Horizon, Newman did not have a duty to disclose a full litany of information unless the omitted information rendered the statements he did make on the call materially misleading. See Matrixx Initiatives, Inc., 131 S. Ct. at 1321. Given the disclaimers that Newman provided in the course of the call, and given the information then available to Newman concerning the history of the rig, we find that Lead Plaintiff has not adequately alleged that the statement that all

equipment was functional "As far as we know" was materially misleading in the context in which it was given.

### D. Section 20(a) Claims

Section 20(a) of the Exchange Act provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). Because the complaint fails to state a claim of a primary violation under Section 10(b) or Rule 10b-5, Lead Plaintiff's claims under Section 20(a) against Newman and Long must be dismissed as well. See Slayton, 604 F.3d at 778.

### CONCLUSION

We hold that Lead Plaintiff has failed to state a claim of securities fraud against Transocean and its current and former CEOs. We once again caution that this holding has no bearing on whether Transocean has substantive liability for the Macondo accident. Despite Lead Plaintiff's attempts to conflate the two issues, they are wholly separate.

For the reasons stated above, defendants' motion to dismiss is granted.

**SO ORDERED.**

Dated:     New York, New York
           March 20, 2012

                                        _____
                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorney for Plaintiffs:**
Gregory M. Castaldo, Esq.
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087

**Attorneys for Defendant:**
John H. Fleming, Esq.
Sutherland Asbill & Brennan LLP
999 Peachtree Street, N.E. Suite 2300
Atlanta, GA 30309

John W. Spiegel, Esq.
Munger, Tolles & Olson LLP
335 South Grand Avenue, 35th Floor
Los Angeles, CA 90071